UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EVA EASON, MEGHAN PARKER, NATIONAL FEDERATION OF THE BLIND, and the CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK | No. 16-cv-04292 (KBF) |

Plaintiffs,

-against-

NEW YORK STATE BOARD OF ELECTIONS, NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES, TODD D. VALENTINE and ROBERT BREHM, in their official capacities as Co-Executive Directors of the Board of Elections, THERESA EGAN, in her official capacity as Executive Deputy Commissioner of the Department of Motor Vehicles, and GREGORY J. KLINE, in his official capacity as Deputy Commissioner for Administration of the Department of Motor Vehicles,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CORRECTED COPY)

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
<u>Attorney for Defendants</u>
120 Broadway - 24th floor
New York, New York 10271
(212) 416-8538

ELIZABETH A. FORMAN
NOAM LERER
Assistant Attorney General
  of Counsel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF THE CASE ........................................................................................... 3

    A. ITS Accessibility Policy .......................................................................................... 3

        1.  Potential New Accessibility Standards? .................................................... 4

        2.  The ITS WebNY Group ............................................................................ 5

    B.  DMV .................................................................................................................... 7

    C.  SBOE ................................................................................................................. 10

    D.  This Lawsuit ...................................................................................................... 14

        1.  Procedural History ................................................................................... 14

        2.  Allegations of the TAC ........................................................................... 16

        3.  TAC Allegations Relating to Hypothetical Activity ............................... 17

        4.  Expert Reports and Contention Interrogatories ...................................... 18

ARGUMENT ................................................................................................................... 19

I.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE
       PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE ........................................... 19

    A. Legal Standards Under the ADA and Rehabilitation Act ............................. 19

    B.  Plaintiffs' Claims Are Moot, Meritless or Abandoned ................................. 22

        1.  SBOE fillable voter registration application ......................................... 25

        2.  The Requests for Voter Information and Public Information (SBOE) ............... 26

        3.  The Current 2009 HAVA Plan for New York (SBOE) ........................ 26

        4.  DMV's Online Voter Registration Application ("Motor Voter") ........ 26

        5.  The Process to Create a MyDMV Account/Log In  ............................. 27

        6.  The MyDMV Address Change Transaction ......................................... 27

        7.  The DMV online application for updating or renewing non-driver identification
           cards ...................................................................................................... 27

i

8.  DMV's Make A Reservation System ................................................... 27

9.  Form MV-44 and ID-44 ...................................................................... 28

10. Form MV-15 ......................................................................................... 28

11. DMV "rules and regulation relating to the gifting of cars to family members." ..28

12. Voter Lookup and Locating Polling Places (SBOE) ........................... 29

13. The SBOE representative look-up ........................................................ 29

14. SBOE absentee ballot .......................................................................... 29

C.  Plaintiffs Lack Standing To Challenge: (1) Website Functions They Have Never
    Used or Tried to Use, (2) Website Functions For Which They Are Unqualified, and
    (3) The Accessibility of the Websites to Persons Using Their Eyes Or Assistive
    Tools For the Sighted ............................................................................... 30

D.  Plaintiffs' Claims Based On The Alleged Inaccessibility of Transactions They Have
    Not Attempted, and May Never Attempt, On Websites That Are Being Continually
    Revised, Are Unripe ................................................................................. 33

II.   PLAINTIFFS CANNOT RELY ON THEIR EXPERT REPORT TO RAISE NEW
      CLAIMS ...................................................................................................... 35

III.  REQUIRING DMV OR SBOE TO EXPEND FUNDS ON SYSTEMS THAT SHOULD
      BE REPLACED, OR HISTORIC PDF DOCUMENTS WITHOUT ELECTRONIC
      ORIGINALS, WOULD BE AN UNDUE BURDEN OR FUNDAMENTAL
      ALTERATION .............................................................................................. 38

IV.   THERE ARE NO GROUNDS FOR INJUNCTIVE RELIEF .......................................... 39

CONCLUSION ........................................................................................................ 43

## TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

Abbott Labs v. Gardner,
    387 U.S. 136 (1967)..................................................................................33

Alexander v. Choate,
    469 U.S. 287 (1985)..................................................................................22

Baez v. N.Y. City Dep't of Transp.,
    No. 14 CIV. 02520 LGS, 2015 WL 3763878 (S.D.N.Y. June 15, 2015)..........................20

Bernstein v. City of New York,
    621 Fed. Appx. 56 (2d Cir. 2015) ..................................................................40

Blum v. Yaretsky,
    457 U.S. 991 (1982)..................................................................................30

Burkhart v. Washington Metro. Area Transit Auth.,
    112 F.3d 1207 (D.C. Cir. 1997)....................................................................22

Childers v. Cty. of York S.C.,
    No. C A 0:06-897-CMC-BM, 2008 WL 2563152 (D.S.C. June 23, 2008) ........................22

City of Los Angeles v. Lyons,
    461 U.S. 95 (1983)....................................................................................40

Clapper v. Amnesty Int'l USA,
    568 U.S. 398 (2013)..................................................................................30

Connecticut v. Duncan,
    612 F.3d 107 (2d Cir. 2010) ....................................................................33-34

Coppi v. City of Dana Point,
    No. SACV111813JGBRNBX, 2014 WL 12589639 (C.D. Cal. Feb. 24, 2014)..................35

Davis v. Kosinsky,
    217 F.Supp.3d 706 (S.D.N.Y. 2016)................................................................34

Dessaint v. Lignel,
    584 F. App'x 30 (2d Cir. 2014)....................................................................23

eBay Inc. v. MercExchange, L.L.C.,
    547 U.S. 388 (2006)..................................................................................41

Erchonia Corp. v. Bissoon,
    No. 07 CIV. 8696 DLC, 2011 WL 3904600 (S.D.N.Y. Aug. 26, 2011), aff'd, 458
    F. App'x 58 (2d Cir. 2012) ........................................................................37

Garcia v. SUNY Health Sci. Ctr. of Brooklyn,
    280 F.3d 98 (2d Cir. 2001) ................................................................................. 19-20

Harris v. Mills,
    572 F.3d 66 (2d Cir. 2009) .................................................................................... 20

Hassan v. Slater,
    41 F. Supp. 2d 343 (E.D.N.Y. 1999), aff'd, 199 F.3d 1322 (2d Cir. 1999) ...................................... 21

Johnson v. Randle,
    451 F. App'x 597 (7th Cir. 2011) ............................................................................. 31

Karvelas v. Milwaukee Cty.,
    No. 09-C-771, 2012 WL 3881162 (E.D. Wis. Sept. 5, 2012) ............................................... 22

Kiryas Joel All. v. Vill. of Kiryas Joel,
    495 F. App'x 183 (2d Cir. 2012) ...................................................................... 30, 33, 42

Kowalski v. Tesmer,
    543 U.S. 125 (2004) .......................................................................................... 30

Lincoln Cercpac v. Health & Hosps. Corp.,
    920 F. Supp. 488 (S.D.N.Y. 1996) ........................................................................... 41

Loye v. Cty. of Dakota,
    625 F.3d 494 (8th Cir. 2010) ................................................................................. 22

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992) .......................................................................................... 30

M-F-G Corp. v. EMRA Corp.,
    817 F.2d 410 (7th Cir. 1987) ................................................................................. 40

Mahon v. Ticor Title Ins.Co.,
    683 F.3d 59 (2d Cir. 2012) .................................................................................... 30

Makarova v. U.S.,
    201 F.3d 110 (2d Cir. 2000) .................................................................................. 23

Malik v. Meissner,
    82 F.3d 560 (2d Cir. 1996) .................................................................................... 23

Marcavage v. City of New York,
    689 F.3d 98 (2d Cir. 2012) .................................................................................... 30

Marchi v. Bd. of Coop. Educ. Servs.,
    173 F.3d 469 (2d Cir. 1999) .................................................................................. 23

McElwee v. Cty. of Orange,
   700 F.3d 635 (2d Cir. 2012) ................................................................................. 20, 31

Mcinnis-Misenor v. Maine Med. Ctr.,
   319 F.3d 63 (1st Cir. 2003) ........................................................................................ 34

Menendez v. Saks & Co.,
   485 F.2d 1355 (2d Cir. 1973), rev'd on other grounds, 425 U.S. 682 (1976) .................. 39

Moody ex rel. J.M. v. NYC Dep't of Educ.,
   513 F. App'x 95 (2d Cir. 2013) .................................................................................. 20

N.Y. State Citizens' Coal. for Children v. Velez,
   629 F. App'x 92 (2d Cir. 2015) .................................................................................. 33

Nat'l Park Hospitality Assoc. v. Dep't of Interior,
   538 U.S. 803 (2003) .................................................................................................. 34

Noll v. Int'l Bus. Machines Corp.,
   787 F.3d 89 (2d Cir. 2015) ........................................................................................ 20

Nutritional Health Alliance v. Shalala,
   144 F.3d 220 (2d Cir. 1998) ...................................................................................... 34

O'Shea v. Littleton,
   414 U.S. 488 (1974) .................................................................................................. 40

Ohio Forestry Ass'n v. Sierra Club,
   523 U.S. 726 (1998) .................................................................................................. 34

Oliver v. Ralphs Grocery Co.,
   654 F.3d 903 (9th Cir. 2011) ..................................................................................... 35

Olmstead v. L.C. ex rel. Zimring,
   527 U.S. 581 (1999) .................................................................................................. 38

Onishea v. Hopper,
   171 F.3d 1289 (11th Cir. 1999) (en banc) .................................................................. 38

Panzica v. Mas-Maz, Inc.,
   No. CV 05-2595 ARL, 2007 WL 1732123 (E.D.N.Y. June 11, 2007) ............................ 35

Parker v. Universidad de Puerto Rico,
   225 F.3d 1 (1st Cir. 2000) ......................................................................................... 21

Parkway Hosp. v. Shah,
   460 F. App'x 21 (2d Cir. 2012) .................................................................................. 23

Pascuiti v. N.Y. Yankees,
    87 F. Supp. 2d 221 (S.D.N.Y. 1999)................................................................38

PGA Tour, Inc. v. Martin,
    532 U.S. 661 (2001)................................................................................................31

Powell v. Nat'l Bd. of Medical Examiners,
    364 F.3d 79 (2d Cir. 2004)...........................................................................20, 38

Rizzo v. Goode,
    423 U.S. 362 (1976)................................................................................................40

Robert Stigwood Grp. Ltd. v. Hurwitz,
    462 F.2d 910 (2d Cir. 1972)................................................................................40

Rodriguez v. City of New York,
    197 F.3d 611 (2d Cir. 1999)..........................................................................4, 19

Shain v. Ellison,
    F.3d 211, 215-16 (2d Cir. 2004)........................................................................40

Simmonds v. INS,
    326 F.3d 351 (2d Cir. 2003)................................................................................34

Temple v. Hudson View Owners Corp.,
    No. 16-CV-3203 (CS), 2016 WL 6993846 (S.D.N.Y. Nov. 28, 2016) ............20

Texas v. United States,
    523 U.S. 296 (1998)...........................................................................................33-34

U.S. Nat'l Bank v. Independent Ins. Agents of Am., Inc.,
    508 U.S. 439 (1993)................................................................................................23

U.S. v. Leon,
    203 F.3d 162 (2d Cir 2000)................................................................................23

United States v. Blackburn,
    461 F.3d 259 (2d Cir. 2006)................................................................................23

United States v. Georgia,
    546 U.S. 151 (2006)................................................................................................20

Warth v. Seldin,
    422 U.S. 490 (1975)................................................................................................30

Williams v. City of New York,
    34 F. Supp. 3d 292 (S.D.N.Y. 2014)................................................................40

Winter v. Nat. Res. Def. Council, Inc.,
   555 U.S. 7 (2008) ...................................................................................................... 39

Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.,
   339 F.3d 101 (2d Cir. 2003) .................................................................................... 41

**CONSTITUTION**

U.S. Const.
   Article III .......................................................................................................... 23, 30

**FEDERAL STATUTES**

29 U.S.C.
   § 794 ...................................................................................................................... 1, 31
   § 794(d) ........................................................................................................................ 3

42 U.S.C.
   § 12131 ................................................................................................................. 1, 31

Americans with Disabilities Act ("ADA"), Title II ............................................ passim

Rehabilitation Act
   § 504 ................................................................. 1, 19, 22, 24, 31, 37-38, 41

**FEDERAL RULES**

Fed. R. Civ. P. 8 ...................................................................................................... 35

Fed. R. Civ. P. 56 ...................................................................................................... 1

Fed. R. Civ. P. 56.1 ................................................................................................... 1

**FEDERAL REGULATIONS**

28 C.F.R.
   § 35.160(a) ............................................................................................................... 22

36 CFR pt. 1194 App. A
   §§ E205.4, 202.6 ........................................................................................................ 4

81 FR 28658-01, RIN 1190-AA65,
   2016 WL 2609932 (May 9, 2016) ............................................................................ 4

82 FR 5790-01 (Jan. 18, 2017) ................................................................................... 4

i

Defendants New York State Board of Elections ("SBOE")  and New York State Department of Motor Vehicles ("DMV"),  Todd Valentine, Robert Brehm, Theresa Egan, and Gregory Kline (collectively, "Defendants") respectfully submit this memorandum of law, with the accompanying declarations ("Decl."), and Rule 56.1 Statement, dated October 19, 2017 ("56.1"), in support of their motion pursuant to Fed. R. Civ. P. 56 seeking summary judgment dismissing Plaintiffs' Third Amended Complaint, dated February 3, 2016 (the "TAC").[1]

## Preliminary Statement

DMV and SBOE are committed to providing accessible online services to the blind and visually impaired.  This suit, which challenges the accessibility of aspects of the DMV and SBOE websites (the "Websites") to the blind and visually impaired under Section 504 of the Rehabilitation Act codified as amended at 29 U.S.C. § 794 ("Section 504"), and Title II of the Americans with Disabilities Act ("ADA") codified at 42 U.S.C. § 12131 et seq. ("Title II"), is an overreaching attack on State agencies that have done everything in their power, and will continue to do everything in their power, to provide Plaintiffs and other visually disabled individuals meaningful access to Defendants' services.  Regardless of the claims asserted in this action, and beginning long before it, Defendants have worked to provide online "accessibility" to the blind and visually impaired—that is, to make sure that the blind and visually impaired have effective access to services and documents available online. Moreover, regardless of this lawsuit, Defendants will continue to improve the Websites and to provide effective services to Plaintiffs, and all visually disabled New Yorkers.  Indeed, SBOE and DMV have plans, as does the State of New York, via the Office of Information Technology Services ("ITS")—

---

[1] Referenced deposition transcript pages are annexed as exhibits to the Declaration of Noam Lerer, dated October 19, 2017,  submitted herewith. Respondents deposed each of the visually impaired individuals whose experiences are relied on in the TAC.   References to Plaintiffs and these witnesses are by last name, and, where needed to distinguish between witnesses, first initial.

plans which, again, preexist this lawsuit—to replace the platforms and programming of the Websites, which will support accessible functions at the highest level.

In these circumstances, there is no legal basis or practical reason for this suit to proceed.  As set out in Point I, and as detailed in the accompanying 56.1 Statement and supporting documents, the accommodations provided Plaintiffs—the current DMV and BOE services on the Websites and multiple alternative effective ways of receiving each of the services Plaintiffs seek—are plainly reasonable, and the claims here are therefore either meritless or moot.  Further, because, in some instances, Plaintiffs and their witnesses fail to demonstrate that they are eligible for the services at issue, or have any conceivable injury-in-fact, they lack standing.  Plaintiffs also lack standing to bring claims on behalf of sighted users—that is, those who use their eyes to review website content.  Plaintiffs' claims are also unripe because they challenge the accessibility of functions or pages on the Websites (which are constantly being modified, updated and improved), which Plaintiffs only have hypothetical future plans to use at some undetermined date.  In addition, (Point II) Plaintiffs attempt to raise, via their contention interrogatory response and expert report, after close of fact discovery, far-reaching and amorphous new claims relating to the Websites not identified in the pleadings or elsewhere. Such claims are not only unripe, but they violate the most basic notice requirements of the Federal Rules, and are profoundly inconsistent with the Court's recent order, Dkt. 142, directing Plaintiffs to provide "clear and precise" information about their remaining claims in order to assist with resolution of this matter.

In addition, III, to the extent Plaintiffs also seek to challenge functions on the websites which cannot be rebuilt or made fully accessible in the manner they seek, such accommodations would constitute "undue burden." The cost of retrofitting outmoded scheduling and database functions, or, as applicable, reformatting visually complex historic documents, would be vastly out of proportion to the available budget of the relevant agencies, and to any benefits gained thereby, and would

compromise the ability of those agencies to meet the needs of the entire public.  Further, as discussed in Point IV, there is no basis for injunctive relief.  There is no hardship to Plaintiffs that would require such relief, and no need for a mandatory remedy against these public entities.  To the extent Plaintiffs seek an injunctive remedy, their claims should be dismissed.

DMV's and SBOE's (and New York State's) commitment to accessibility extends far beyond the parameters of the claims in this lawsuit.  DMV and SBOE stand ready to address any and all problems with accessibility on the websites (and any associated functions) raised by handicapped individuals (including the Plaintiffs) to the extent possible, and to discuss any and all such concerns and requested changes to the websites with Plaintiffs, their counsel, or others in an attempt to better assist all the state's residents.  This suit, however, is an unnecessary, resource-draining incursion on the efforts of these agencies to continue to modernize and update their sites and to serve the public.  At this juncture, no legal basis, and no need, for injunctive or declaratory relief exists.  The Court should therefore grant summary judgment and dismiss this matter.

## STATEMENT OF THE CASE

### A.  The ITS Accessibility Policy

ITS  provides technological resources for New York's executive agencies, including DMV.  ITS also sets standards for New York State executive agencies with regard to website accessibility.  56.1 ¶¶ 84-85.  In 2010, ITS adopted the current New York State accessibility policy, which provides minimum accessibility requirements for web-based information and applications for the State.  That policy is not law—it is State policy. See Adkins Decl. Ex. A ("ITS Policy").  There are, in fact, no technical standards specifically relating to website accessibility under Title II of the ADA, the Title that applies to state agencies.  The ITS Policy was based on regulations promulgated under Section 508 of the Rehabilitation Act codified as amended at 29 U.S.C. § 794(d) ("Section 508") for use by the federal government (but not the states).  56.1 ¶ 86.  Section 508 was never adopted by the

United States Department of Justice ("DOJ"), which promulgates regulations under the ADA, for use by state governments under Title II. Nor were any other technical guidelines. The ITS Policy aims, *inter alia,* to ensure that: (1) that web content is usable by blind individuals reliant on assistive technology, such as screen readers or text to braille, and (2) web content permits visual navigation by the visually impaired, for example, by allowing users to adjust the color contrast on a web page. Compliance with the standard, under the ITS policy, is not required where it would cause a fundamental alteration in a relevant service, program, or activity, or would result in an undue financial and administrative burden. ITS Policy §§ 3.0, 4.0 (5/17/2010). The ITS Policy also provides that all state contracts and solicitation documents must conform to this standard. Id. § 4.

**Potential New Accessibility Standards?**

The Access Board has recently modified its 508 standards to require federal (but, again, not state and local) agencies, beginning January 18, 2018, to conform new electronic content to the Level A and AA "success criteria" set forth in WCAG 2.0 guidelines ["WCAG 2.0AA"] if such conformance does not constitute an "undue burden" or "fundamental alteration." 36 CFR Part 1194 App. A §§ E205.4, 202.6; Information and Communication Technology (ICT) Standards and Guidelines, 82 FR 5790-01 (Jan. 18, 2017) (compliance date). Old web content is grandfathered; any ICT that complies with the Original Section 508 Standards and "has not been altered on or after January 18, 2018, shall not be required to be modified to conform to the Revised 508 Standards." Id. §§ E202.2; E103.4 (alteration defined). Although ITS has the right to modify its state policy when new Section 508 standards come into effect, see ITS Policy § 3.0, it has not done so. 56.1 ¶ 87. Again, no comparable regulations have been promulgated under the any statutes applicable to Defendants.

More than a year ago, DOJ issued a (Supplemental) Advance Notice of Proposed Rulemaking ("SANRPM") regarding Title II. 81 FR 28658-01, RIN 1190-AA65, 2016 WL 2609932 (May 9, 2016). That notice states that the DOJ is "considering proposing WCAG 2.0 Level AA as the accessibility

standard that would apply to Web sites and Web content of title II entities." Id. § II B(1). The SANPRM would provide entities two years to comply after publication of the final rule (unless compliance would result in a fundamental alteration or undue burden), and would also exempt archival web content, and certain preexisting electronic documents (generally, informational word documents and PDFs similar in nature those that Plaintiffs here claim must all be made accessible online immediately), and certain third party content. Id. §§ II (B)(2), III.

This proposed regulation has not been adopted. Indeed, the SANPRM has now been placed on a list of "inactive" rulemakings, indicating that a rule is not likely to be finalized in the near future. As such, the appropriate technical standards for any regulation relating to website accessibility under Title II remain in dispute.[2] Nonetheless, in anticipation of the potential adoption of a new standard, ITS staff has informally advised State agencies to prepare for some version of the WCAG 2.0 AA standards. Adkins Decl. ¶ 6. ITS does not require, and has not required, State executive agencies to "retro-fit" all existing executive agency websites, however, in anticipation of any proposed change. To do so would be costly, inefficient, and, as discussed in more depth below, unnecessary in light of planned changes to all the New York State executive websites, discussed below, and to the specific websites at issue in this matter, with regard to which systems will soon be replaced. 56.1 ¶¶ 88, 89.

### 1. The ITS WebNY Group

Within ITS, the WebNY group addresses many of the shared aspects and goals of all New York State executive agency websites. WebNY, a unit of approximately 50 people, is responsible for, among other things, the overall re-development and delivery of the public-facing websites in New York in support of the State's recent redesign initiative, intended to improve and modernize the online services provided to New Yorkers by re-platforming all the New York State executive sites, moving them to an accessible "Drupal 8" platform. That is, as relevant to this matter, WebNY will be replacing

---

[2] https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf at RIN 1190-AA65.

the content management systems which support the current DMV "informational" website.  56.1 ¶ 98.  This new Drupal 8 platform is being designed from the ground up—with custom software and functions.  The first agencies began migrating functions to this platform this year—for example, New York State Police Amber Alert functions are now on the new platform.  The platform is designed to the WCAG 2.0 AA standard and is being deployed on additional websites as WebNY moves forward.  It is also designed, with a variety of built-in testing tools, to assist agencies in assuring that content provided by State agencies will be accessible.  Id.

The WebNY group provides accessibility resources for State agencies, including DMV, including tools, guidance and consulting services to ensure the State agencies and entities are able to publish accessible information to support their missions and objectives.  See generally https://its.ny.gov/webny; 56.1 ¶ 91. At least five members of the staff at WebNY have Accessibility Certification through the company Siteimprove, a provider of website assessment software, in both the technical and non-technical tracks.  Topics covered by this training include WCAG and 508 accessibility guidelines, website optimization, accessibility testing and tools, as well as technical training on page structure, responsive design and frameworks, semantic markup, accessible data tables and forms, accessibility and content management systems, and how to trouble shoot common accessibility issues.  56.1 ¶ 92.

The WebNY group at ITS makes available to all State agencies, via an internal State SharePoint site, informational resources, training, software, and other technology designed to facilitate and ensure accessibility across many State websites.  Id. ¶ 93.  An ongoing initiative at ITS, part of the WebNY plan developed before this lawsuit,  is contracting  to employ visually disabled testers to perform user testing of state websites, as they are replaced and altered.[3]  Id. ¶ 94.  ITS does and will provide

---

[3] See https://www.abilityone.com/OA_HTML/ibeCZzpHome.jsp?minisite=10102&respid=22372&grp=NIB_NYSPSP_SITES  (explaining New York State Preferred Source Program For People Who Are Blind);

accessibility training, accessibility tools, and visually disabled testers (via this "preferred provider" contract) to review the portions of websites maintained by ITS and those maintained by other State agencies or entities.  Adkins Decl.  ¶ 95.

### B. DMV

All initial licensing and identification transactions require a visit to a DMV office, so that the individual's identity can be ascertained.  Name changes also require an in-person visit to a DMV office. Voter registration applications are available at all DMV offices both via forms or, if an individual chooses, by having a DMV worker fill out the relevant form.  56.1 ¶¶ 1, 4, 8.

Once a license or identification document has been received by an individual, DMV offers a variety of online transactions; all those transactions can also be performed in a DMV office, or, if the individual prefers, by telephone.  Id. ¶¶ 3, 9, 66-69.  For example, DMV, through the MyDMV portal, offers services such as identification renewals and address updates.  Id. ¶ 11.  For individuals with DMV-issued identification, DMV also offers certain "stand alone" electronic functions, which do not require the individual to sign in to MyDMV, including license/ID renewal and voter registration applications (this standalone function is commonly referred to as "Motor Voter."). Both renewal transactions (MyDMV and standalone) offer the license/ID holder the option of becoming an organ donor and making an application to register to vote online.  The address change function also offers the user the opportunity to update his or her voter registration.  Id. ¶¶ 11-13.  All these transactions are also available by telephone and in person.  Id. ¶¶ 3, 66-73.

These "transactions" available on the DMV website were generally created, and are maintained, by the DMV "Cluster" at ITS, headed by Michael Allen.  Id. ¶¶ 16-17.  This cluster at ITS has extensive accessibility training, and uses a variety of accessibility testing tools.  ITS recently

---

https://www.abilityone.com/OA_HTML/xxnib_nyspsp_Services.jsp?sitex=10102:22372:US&section=10922 (page describing some of the testing services to be available through this Preferred Source Program).

completed a "replatforming" of the DMV transactions and updated some of the transactions, including by reviewing their accessibility.  Id. ¶¶ 73-77.  Moreover, ITS has begun a more far-reaching re-platforming of the DMV transactions, this time including both the DMV in-office functions with the ITS-administered transaction.  Id. ¶¶ 96-97.  As part of this process, ITS expects to fully revisit and retest the accessibility of the transactions.  Id. ¶ 97.  In fact, Plaintiffs' expert report in this lawsuit did not  challenge the ability of blind and visually impaired individuals to undertake the transactions. [4]

There are approximately 60 transactions on the DMV Website.  There are also approximately 1000 HTML ("Hypertext Markup Language," the standard language for website design) pages, and approximately 500 different "forms" in PDF format (PDF is an acronym for "Portable Document Format" which references the ability of such documents to be used across a variety of different systems).  Id. ¶ 15.  As relevant here, the HTML pages include a text only home page, formatted for accessibility to the blind and visually disabled, with the functions of the main DMV Home Page (that home page dates to 2014 and is slated for replacement this year), Id. ¶ 49-41,  an accessibility page, Id. ¶ 52, which provides a variety of forms and links of particular usefulness to the blind and visually disabled, an accessible HTML informational page with the identification requirements for obtaining a DMV license or ID (there is also a PDF form that does this, the ID-44, id. ¶¶ 5-6), and an accessible page that provides information about vehicle transfers.  Id. ¶ 43.  DMV, as explained on its ADA page, and elsewhere, will provide any document on its site in the requested accessible format.  Id. ¶ 42.  Such requests may be made by telephone or email, among other ways.  Id. ¶¶ 52, 71.  Moreover as mentioned above, any individual may contact DMV about any service, or accessibility concerns,  by telephone, or email,  if he or she so chooses.  Id. ¶¶ 45-46.

---

[4] ITS intends to remove the CAPTCHA on the MyDMV sign-in page, about which Plaintiffs' expert did complain, by the end of this month.  Id. ¶ 82.

The DMV PDF forms cover every topic from emissions inspector licensing to appeals of traffic violations, as well as informational documents. Many of those forms have recently been reformatted by a vendor, Braille Works, and reposted. Those forms (with their purpose and date of posting on the DMV website) include: the MV-44 and ID-44 (initial licensing application and identification requirements) (last posted 9/25/17 and 10/17/17, respectively), the MV-232 (fillable PDF address change form) (last posted 9/25/17), MV-15 (request for driving records) (last posted 9/25/17), and MV-82TON (10/17/17) and MV-82 (9/25/17) (these forms overlap, with the MV-82 relating to title and registration transfers, and the MV-82TON relating only to the title transactions— but either could be used for a title transaction). Id. ¶ 36. DMV plans to reformat all its PDF forms to assure their accessibility; it also will provide, as set out on the website, via request by telephone or email or otherwise, any form or other document in the requester's chosen accessible format. Id. ¶¶ 29-40, 42.

The "informational" portion of the site is operated by DMV's Web Services Office ("WSO"), whose head is Casey McClenon, with assistance from DMV's vendor, Rayogram, which designed the site in 2014. The Rayogram contract explicitly requires conformance with the ITS policy and 508 standards. Id. ¶¶ 16, 19. DMV also uses Rayogram for maintenance of that site, including review and implementation with regard to any accessibility issues. ¶ 20. Rayogram's contract is expiring; the IFB ("information for bid") for a new contract requires conformance with the ITS policy, as well as WCAG 2.0 AA standards. Id. ¶ 22. The WSO's employees have been trained in accessibility and possess and use a variety of accessibility testing tools. Id. ¶¶ 23-27. In addition, the WSO anticipates requesting funding for the use of blind testers. Id. ¶ 28. Apart from this suit, WSO has never received a complaint with regard to the accessibility of the informational portion of the DMV website. Id. ¶ 53.

DMV also offers the Make A Reservation function, which is not maintained by ITS, but rather by an outside vendor (not Rayogram). That system is at "end of life" and slated for replacement. Id.

¶¶ 54-56.  The cost of updating that system to retrofit it for improved accessibility would be beyond DMV's financial capacities, id. ¶¶ 59-60.  To accommodate blind and visually impaired individuals, DMV developed a designed and published a submittable online form that permits blind and visually handicapped individuals to make a reservation in their chosen DMV office when they wish to visit in person.  This form, which was posted on September 29, 2017, is available on the DMV accessibility page.  Individuals who use this form receive an email or phone call confirming their appointment to which they can respond, by email or phone, to alter or cancel their appointment, if they choose.  Id. ¶ 61-65.

## C. SBOE

SBOE is the bipartisan agency responsible for administering and enforcing laws relating to elections in New York State.  56.1 ¶¶ 100, 101.  There are literally, dozens of ways to apply to register to vote in New York State., including, as set out above, through DMV's online transactions.  Id. ¶ 102-11.  All applications for voter registration, with the exception of those through DMV, require an original signature.  Id. ¶ 115.  Unlike the process of marking a ballot, voter registration-related information, including party affiliation and whether or not one voted, is public information.  Id. ¶¶ 116-17.  Voting registration applications need not be in a special format—technically, one could apply to register to vote on a napkin, provided the application included the required information.  See id. ¶ 113.  Where a voter registration application is unsigned, the local board will send a signature card to the applicant.  Id. ¶ 112.  Voting registration applications are ultimately examined and accepted by local (City or County) boards of elections, not SBOE.  Id. ¶ 114.  Among the voting forms offered by SBOE is an online HTML form, which converts to a PDF for signature.  Id. ¶¶ 106-08.  That form was created as part of the stipulation settling the first preliminary injunction motion in this lawsuit.  In light of the claims in Plaintiffs' expert report, Tom Connolly, the Director of Election Operations, and formerly Deputy Direction of Public Information, recently checked that form himself, to make

sure that all the fields were filled out when it converted to PDF; the form populated correctly.  Id. ¶ 108.  SBOE's PDF form for absentee voting (which is printed and signed) was recently updated; the most recent version was posted on September 29, 2017.  Id. ¶¶ 124-26.

The SBOE website contains, among other things, 131 HTML pages, approximately 2500 PDF documents, and 69 Excel spreadsheets.  Id. ¶¶ 122-23.  The SBOE website contains both what SBOE refers to informally as "static" and "dynamic" content.  Id. ¶ 124.  The static portion of the website includes informational text, PDF informational documents, historic materials (such as records of election tallies and results), political calendars and webcasts of meetings of the SBOE Commissioners (accessible transcripts are also provided of all such meetings).  There are also political calendars, operative plans under the Help America Vote Act of 2002 ("HAVA"), and the absentee ballot application, as well as an interactive map of county boards.  Id. ¶ 127.  SBOE does not post ballots on its website.  Id. ¶ 128.  The website also includes two interactive forms permitting individuals to request different kinds of public records, those forms are accessed by a CAPTCHA whose accessibility Plaintiffs question, see id. ¶ 141; Plaintiffs neglect to point out that the exact same documents can be requested via email link on the same page without any form or CAPTCHA.  Id. 142.

SBOE's policy and practice since at least 2008 (when the "static" portion of the current SBOE website was created) has been to ensure wherever possible that any content on the website is accessible to blind and visually impaired individuals.  Id. ¶ 143.  Hope Hardwick, who was the primary creator of the static site, and remains its primary developer, tested accessibility with the Adobe Dreamweaver tool and the HiSoftware tool when this portion of the website was created.  Id. ¶ 144.  Prior to the creation of the website, she received a series of live accessibility trainings.  Id.  As a result of this training, she has continued to test website content regularly for accessibility after the website's creation—she has and uses a variety of accessibility tools in this regard.  Id. ¶¶ 145, 150, 151.  Forms and content created for the SBOE website have been either designed or remediated, to promote

11

accessibility.  Id. ¶ 146.  SBOE's website contains an accessibility page, which explains the format of

the website, and the documents located on it. Moreover, SBOE's accessibility page expressly provides:

"If you require a document in a different file format than we currently provide, you can request it

from us and we will try to accommodate you." Id. ¶ 152.  There is a live link in this sentence to an

email addressed to SBOE. Moreover, SBOE has assured that its voter forms—the fillable PDF voter

registration and absentee ballot requests, as well as campaign finance disclosures, and HAVA

administrative complaints—are accessible by sending them to an outside vendor, generally Braille

Works, for reformatting for accessibility.  Id. ¶ 154.  Users may also request print documents by

contacting the SBOE Public Information Office, or telephone.  Id. ¶ 151, 153.    The SBOE

accessibility page contains a separate live email link for any concerns or questions about accessibility.

Id. ¶ 152.  On request, whether by email or telephone, SBOE will email or mail any form or document

requested, including, for example, a handbook containing campaign forms.  Id.  SBOE also maintains

some historic, informational documents on its website (of the type that would be excepted from the

new standards under the proposed DOJ regulation that was never passed, discussed above), for

example about 400 spreadsheets and PDFs containing vote tallies for many years).  Id. ¶¶ 156, 164.

Such documents cannot economically be converted to a conventional accessible format; they will be

sent to a vendor for such formatting on individual request.  Id. ¶ 165.

The "dynamic" portion of the SBOE website provides access to data drawn from a number

of preexisting databases dating back as far as the 1990s.  Id. ¶ 129. The primary purpose of these

databases is to support SBOE's execution of its statutory duties under the New York Election Law.

Id. ¶ 173.  Those databases contain, for example, (1) campaign financial disclosure information relating

to political candidates (referred to as the "CAPAS/FIDAS" database), and (2) voter registration

information.  Id. ¶ 129.  In fact, many of Plaintiffs' witnesses testified to being able to use these

database functions successfully; they were able to use the voter lookup, polling place, and elected

official functions.  Id. ¶¶ 132-33.  SBOE employees have recently tested the representative and voter look search functions with screen readers and found them to be usable with a screen reader.  Id. ¶ 186.

In addition, on election nights, SBOE posts non-final, temporary, unofficial vote tallies as they are received.  That function is generally only available around the time the election is actually occurring, and is currently being worked on in anticipation of this year's elections.  Id. ¶ 137-38.

None of these functions are new—SBOE is in the process of trying to upgrade the databases, the first major upgrade being to the CAPAS/FIDAS database, which SBOE is required to maintain under State law.  Id. ¶ 139.  There is substantial time and financial pressure on this project.  Id. ¶¶ 174-80.  Once this project is complete, SBOE plans to begin addressing the other databases, as well as the static portion of the website.  Id. ¶¶ 180-82.  In the meantime, with regard to any of the other database functions, if any individual feels he or she would like to receive such materials in any particular format, the Public Information Office will perform the search and provide the result, consistent with its posted policy.  Id. ¶¶ 140, 154.  Moreover, while SBOE is taking steps to improve the accessibility of these features, it is proceeding cautiously because of the technical limitations of those systems.  There is a significant risk that changes on the public portions of the dynamic portions of the website (voter lookup, etc.) will result in the system crashing on the front-end (public facing website), denying these services to the entire public; a particularly unfortunate result in advance of the 2017 general election.  Id. ¶¶ 183-84.  Nonetheless, to the extent that improvements to the accessibility of the information generated dynamically by these functions (that is, databases) are possible given the age and configuration of the systems at issue, SBOE plans on continuing to make such improvements—and as appropriate, introducing accessible alternative ways of receiving the same information when it is posted to the website.  Id. ¶ 185.

### D.  This Lawsuit

#### 1.  Procedural History

Plaintiffs filed the instant suit on June 6, 2016.  Dkt. 1.  The complaints in this matter allege that SBOE and DMV fail to provide blind voters a "quick, convenient, and confidential <u>online ways to register to vote</u> or <u>to change their names</u> or addresses for voting."  <u>Id.</u> ¶ 1; TAC ¶ 1.  However, as set out above, for DMV there is a fundamental, initial, in-person appearance required for all transactions establishing a person's identify, or changing their name.  SBOE, for all applicants (except those with regard to which DMV has already verified their identity in person), requires an original signature on voter registration applications.  Thus, this central allegation of the complaint demands online services that do not exist.  These services are available to <u>no</u> member of the public.

On July 8, 2016, Plaintiffs filed a motion for a preliminary injunction regarding certain voter-registration-related forms on Defendants' websites and alleged navigation barriers on the voter registration portions of those websites.  Dkt. No. 27.  On August 10 the parties stipulated to resolve the preliminary injunction.  Dkt. 47.  The stipulation included specific technical undertakings by DMV and SBOE; nothing in the current operative pleading, which post-dates the time those changes were agreed to be completed, alleges that such alterations to the website have not been accomplished.  Nor have Plaintiffs or their counsel contacted Defendants to request further modifications to the website consistent with the stipulation.

On October 4, 2016, Plaintiffs again sought emergency relief, this time regarding DMV's online address change function, Dkt. 75, a function not mentioned in their complaint, and a claim of which DMV had no previous notice.  Plaintiffs' supporting submissions identified Plaintiff Meghan Parker (then Meghan Schoeffling) as the individual who "needed to update her address for voter registration after moving."  Dkt. 82 at 2, 12. <u>See</u> Scott Decl., Dkt. No. 85, 11-13. On October 7, the Court denied Plaintiffs' motion, holding, *inter alia*, that Plaintiffs had "failed to show a likelihood of

success on the merits regarding whether the shortfalls in online functionality result in a lack of 'meaningful access' to change-of-address procedures."  The Court explained that "the record does not support a lack of meaningful access to 'change of address' options generally.  It is undisputed that a change of address for DMV/voter registration purposes may be accomplished by telephone call, mail, or an in-person visit."  Dkt. 87 at 4-5.  The Court also reasoned that, with regard to the balancing of hardships, the injunctive relief sought was not appropriate, given the "feasibility of the requested relief" (Defendants had provided proof that the change to the website demanded by Plaintiffs could not be accomplished on the time-line demanded by Plaintiffs) and the "likelihood defendants were not on notice of any obligation to implement the relief requested (if such an obligation exists)."  Id. at 4-6. A week later, Ms. Parker was able to successfully complete the change of address transaction independently (the same transaction which was allegedly inaccessible, and served as the source of the injunction application).  Lerer Decl. Ex. B, Parker Tr. 64-66 (testifying to successful address change transaction after using more current version of JAWS assistive technology).

Plaintiffs then responded by amending their complaint in an attempt to expand the action's scope to include the entirety of both websites.  Plaintiffs did not specify in the Second Amended Complaint what aspects of the non-voter registration portion of the websites they deemed to be inaccessible, or identify individuals who had allegedly been harmed by the inaccessibility of those specific functions of the websites at issue.  Dkt. 90-91, 95-6.  Defendants moved to dismiss, arguing that the Plaintiffs lacked standing to challenge the Websites in this manner because their factual allegations only related to their experiences with voting registration.  Dkt. 99.

The Court granted the motion to dismiss. The Court explained that "here where we have a merger of standing and sufficient allegations regarding relief, we come up short."  Dkt. 132 at 4:9-11. Although the Court noted that, under the circumstances, the Court would usually dismiss such a matter in its entirety, in this case the Court noted that a new lawsuit could be brought on the specific

factual allegations raised by Plaintiffs' witnesses in opposition to the motion to dismiss, and, accordingly, granted Plaintiffs leave to amend their complaint to incorporate any  concrete factual allegations and claims included in Plaintiff's newly-filed  opposition declarations., id. at 4:12-17., On February 3, the Plaintiffs filed the TAC,  the operative pleading in this case.  Dkt. 128.

### 2.  Allegations of the TAC

Plaintiffs allege that certain specified SBOE Website functions and pages are not accessible to the blind and visually impaired.  With regard to SBOE,  Plaintiffs' claims relate to:  (1) SBOE's voter registration form, TAC ¶¶ 30-34 (Eason, March, 2016[5]); (2) two different requests for information forms on the SBOE website, one for public information, and one for voter information, both which require that the user fill out a CAPTCHA (to show that the submitter is human), TAC ¶¶ 50-51 (Sumlin, December 7, 2016); and (3) the pdf containing SBOE's current Help America Vote Act Plan (which dates to 2009) TAC ¶ 52 (Sumlin, December 7, 2016).[6]

Plaintiffs also allege that certain DMV website functions are inaccessible: (4) DMV's  online voter registration application, TAC ¶¶ 32, 35 (Eason, March 2016); (5) DMV's process to create a "MyDMV" account (which, as set out above, for holders of DMV-issued licenses and identification provides access to a variety of online services), TAC ¶ 35 (Parker, June 2015); (6) the MyDMV address change application, TAC ¶ 49 (Jacobs, December 9, 2016); (7) the DMV online application for updating and/or renewing non-driver ID cards, TAC ¶¶ 39, 46 (C. Jacobsen, December 5, 2016); (8) DMV's system for making a reservation to visit a DMV office, TAC ¶¶ 41, 47 (C. Jacobsen and M. Jacobsen, December 5, 2016); (9) a PDF purportedly listing documents needed to bring to the DMV to renew identification cards, TAC ¶ 47 (however,  the form specified by Plaintiffs in this regard, the

---

[5] The name of any blind or visually handicapped person who is alleged to have been unable to access the service or function and the date of that attempt, as identified in the TAC and/or Plaintiffs' Interrogatory Responses, follows the allegation in parentheses.

[6] HAVA plan available at https://www.elections.ny.gov/NYSBOE/hava/2009_Amended_State_Plan.pdf.

MV-44, has nothing to do with identification renewals, 56.1 ¶¶ 5-7); (10) DMV's "Make A Reservation" function, TAC ¶ 41 (C. Jacobsen December 5, 2016); and (11) DMV's "MV-15" PDF form used to request one's own driving records, or, in very limited circumstances, records of third parties, TAC ¶ 40 (C. Jacobsen December 5, 2016).

### 3.   TAC Allegations Relating to Hypothetical Activity

Plaintiffs also allege that certain individuals intend or might like to utilize other website components or functions at an indeterminate future date, including: (12) "DMV rules and regulations" relating to "the gifting of cars to family members" TAC ¶ 43 (C. Jacobsen); (13) FOIL requests, signing up to be an organ donor, and applying for initial identification documents, id. ¶ 44 (C. Jacobsen) and, (14) on SBOE's website, to use "political calendars, learn who elected officials are, and check election results," id. ¶ 37, (Parker); (15) confirming voter registration and location of polling places, TAC ¶ 57 (Karina Lopez).[7]   However, no allegations are made in the TAC that these functions are inaccessible to Plaintiffs, nor did any Plaintiff or witness testify that he or she tried to use these functions unsuccessfully.   In any event, as explained in the declarations submitted in support of this motion to for summary judgment, all the functions and pages mentioned in the TAC (to the extent they are currently online), along with many others, have been undergoing a process of alteration and accessibility improvements by the relevant State agency, some after the date of Plaintiffs' alleged experiences with the Websites, and the process of updating and improving the Websites continues to this day.[8]

---

[7] Plaintiffs' counsel subsequently withdrew the allegations relating to Ms. Lopez.

[8] Plaintiffs' witnesses testified at deposition with regard to various additional PDF documents and services on the Websites that they alleged they tried, and could not successfully use,  but which were never identified in the TAC.  In particular, witnesses testified with regard to (16) the SBOE absentee ballot  (C. Jacobsen Tr. 34) (looked at accessibility of SBOE absentee ballot to prepare for his deposition because he thought "someday in the future I might be travelling on election day") (17) an old HAVA implementation plan (Id. 92) (Parker tried to look at an old, historic  HAVA implementation plan and some HAVA-related documents (not the current plan, which was mentioned in the TAC) which were not accessible online in June 2017, as a result, she scanned some of them using an OCR (or "optical character recognition" function) and could  read them this way).  Although these claims were not pled in the TAC, SBOE and DMV previously made, or are making,  all these documents and functions accessible to the extent possible, sending all relevant forms on

At deposition, Plaintiffs' witnesses mentioned additional website functions they might, hypothetically, use in the future. [9] With regard to these items—which were not pled—these witnesses did not state that they had had ever used the function, or when they planned to use the specified portion of the website, and in, many instances, did not clearly identify what functions or forms on the website they might like to use, and some of the items mentioned are not even found on the websites at issue.

### 4.   Expert Reports and Contention Interrogatories

Fact discovery in this matter closed on August 18, 2017.  On August 11, 2017, Defendants served plaintiffs with contention interrogatories. Plaintiffs initially refused to respond to Defendants' Contention Interrogatories.  On September 20, 2017, the Court directed Plaintiffs to do so.  Dkt. 142. The Court determined that "defendants are entitled to understand with precision the particular portions of the websites that plaintiffs claim are inaccessible."  The Court also noted that it appeared that "clarity on the plaintiffs' specific concerns" would assist with resolution of this matter.  Id. at 2-3.  Further, given the variations in the Websites over time, the Court instructed Plaintiffs to "pick a date—upon which to base their responses." Id.

---

their Websites to an outside vendor, usually Braille Works, for remediation and improvements for accessibility, including the absentee ballot form, operative HAVA plans, and HAVA determinations. 56.1¶¶157, 158, 160.

[9] These items include:  driver's license requirements  (M. Jacobsen Tr. 64) (will want to know requirements for driver's license because at some point in the future because her grandchildren would be getting licenses);  job listings ( Id. 109) (might want look at SBOE site because witness might want an unidentified  job at SBOE at some point in future); ballots and campaign rules (L. Lopez Tr. 106) (wants to use website to "read ballots"9 and "campaign rules" but has not tried to do so, and has no plans to do so); board meeting transcriptions and applications for candidacy for public office (Sumlin Tr. 48-49) (has not tried to use SBOE website since 2016; may want in future to make FOIL request, look at board meeting transcriptions, and applications to be candidate for public office, but has not tried to access any of these, and does not know what he will use in the future or when);  the MyDMV "update" functions  as a whole (Parker 77-78) (wants to use MyDMV to update her non-driver ID in the future and pay any "registration fees," but has no specific need at present to do so); ballot initiatives (id. 104-07) (may want to look up ballots and  initiatives and other "policy related information" on website in the future, but has never looked for these items and does not know if they are even on SBOE website); unspecified HAVA information (id. 107-08) (may want to look at HAVA information in the future, but does not know what information or for what purpose and has no specific future plans to use SBOE website).

The parties exchanged expert reports on October 4, 2017.  Jonathan Avila, an employee of Level Access, Inc., prepared a report on behalf of Defendants, a true copy of which is annexed to the Avila Decl. as Ex. A ("Avila Rep.").  Sharon Rush, an employee of Knowbility, Inc., prepared a report on behalf of Plaintiffs, a copy of which is annexed to the Lerer Decl. as Exhibit I. ("Rush Rep.").

On October 5, 2017, Plaintiffs served their responses to the Defendants' contention interrogatories, a copy of which is annexed to the Lerer Decl. as Ex. J ("Pl. Interrog. Resp.")  Plaintiffs initially identified some alleged technological barriers that had been "improved"; however, when requested to identify the portions of the Websites they currently contend are not accessible (Interrogatories 3 and 7), they relied solely on their expert report. Strikingly, despite the Court's express instruction, neither the Rush Report nor the interrogatory responses (which expressly incorporate the expert report) provide a date on which the responses are based.  Nor, as explained in more detail below, despite the Court's explicit direction,  did the Rush Report which was used by Plaintiff to answer the interrogatories, contain a "clear and precise statement" of the scope of Plaintiffs' current claims, that is, what pages or functions of the website Plaintiffs deem inaccessible as of a specified, current, date.

## ARGUMENT

### I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

#### A.  Legal Standards Under the ADA and Rehabilitation Act

Because Title II of the ADA and Section 504 of the Rehabilitation Act "impose identical requirements," courts "consider these claims in tandem." Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999); see also Garcia v. SUNY Health Sci. Ctr. of Brooklyn, 280 F.3d 98, 112 (2d Cir. 2001) (explaining "§ 504 of the Rehabilitation Act and Title II of the ADA offer essentially the same protections for people with disabilities").  In order to establish a *prima facie* claim under either

provision, a plaintiff must demonstrate, "(1) that she is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; (3) "that she was 'denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.' " Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009) (quoting Powell v. Nat'l Bd. of Medical Examiners, 364 F.3d 79, 85 (2d Cir. 2004).[10]  A defendant discriminates "when it fails to make a reasonable accommodation that would permit a qualified disabled individual to have access to and take a meaningful part in public services." McElwee v. Cty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012) (internal quotation marks omitted).

A reasonable accommodation provides "meaningful access" to public services.  The statutes "do not require optimal accommodations." Moody ex rel. J.M. v. NYC Dep't of Educ., 513 F. App'x 95, 96 (2d Cir. 2013) (internal quotation marks omitted); see also Temple v. Hudson View Owners Corp., No. 16-CV-3203 (CS), 2016 WL 6993846, at *4 (S.D.N.Y. Nov. 28, 2016) (ADA "does not require provision of 'a perfect accommodation or the very accommodation most strongly preferred' ") (quoting Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 95 (2d Cir. 2015)).  If the accommodation offered to a plaintiff is "plainly reasonable," the defendant is entitled to summary judgment dismissing the claim.  Noll, 787 F.3d at 94; see also Moody, 513 F. App'x at 96.  Nor do these statutes, Plaintiffs' claims to the contrary, necessarily require precisely "equal access or equal results for individuals with disabilities." Baez v. N.Y. City Dep't of Transp., No. 14 CIV. 02520 LGS, 2015 WL 3763878, at *2 (S.D.N.Y. June 15, 2015).  Thus, proof of relative inconvenience, without more, is not sufficient to establish a claim under these statutes.  Id. at *2 (dismissing Title II claim by wheelchair-bound plaintiff

---

[10] Defendants include not only officials, but BOE and DMV themselves.  To the extent Plaintiffs still purport to bring claims against BOE and DMV directly under Title II, they are barred from doing so.
United States v. Georgia, 546 U.S. 151, 159 (2006) (Title II only validly abrogates state sovereign immunity for conduct that violates the Fourteenth Amendment); Garcia, 280 F.3d 98 at 109-113 (similar).

for elimination of certain bus stops ); see also Hassan v. Slater, 41 F. Supp. 2d 343, 350–52 (E.D.N.Y. 1999), aff'd, 199 F.3d 1322 (2d Cir. 1999) (dismissing ADA claim based on closure of train station).

As this Court has recognized, the standard for accessibility under Title II for websites is, at base, a functional one.  The Websites' adherence to a specific technical standard, such as WCAG 2.0 AA, is not the test for a "reasonable accommodation." Rather, the user should receive meaningful access to the particular service sought.  See Tr., Dkt. 55 (8/19/16), at 28-29 ("WCAG is not in and of itself necessarily what constitutes the legal equivalent of meaningful access. . . . It's possible that it just so happens that fortuitously WCAG ends up being that equivalent. It may be that it does more than what is necessary for meaningful access.").  Further, as discussed above in the Statement of the Case, even federal agencies, which (unlike Defendants) are subject to regulations specific to website accessibility, are only required to begin complying with WCAG 2.0 AA on January 18, 2018, and only for electronic content that is created or significantly altered after that date.

As such, as also recognized by this Court, this matter is a "program" or "services" case – that is, a case relating to a specific government-provided programs or services.  As this Court held, an individual who is unable to access a certain government "service" or "program" using a defendant's website may nevertheless have meaningful access to the service or program through other means.  For example, this Court determined that Plaintiffs were not entitled to a preliminary injunction because "plaintiffs have not shown a likelihood of success on the question of meaningful access vis-à-vis change-of-address opportunities" because it was "undisputed that a change of address . . . may be accomplished by telephone call, mail, or an in-person visit."  Dkt. 87 at 4.

This approach is supported both by regulations and case law under Title II.  28 C.F.R. § 35.150 (stating in the Subpart on "Program Accessibility", that [a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities" (emphasis added); Parker v. Universidad de

Puerto Rico, 225 F.3d 1, 6 (1st Cir. 2000)) ("Title II's emphasis on "program accessibility" rather than "facilities accessibility" was intended to ensure broad access to public services, while, at the same time, providing public entities with the <u>flexibility to choose how best to make access available</u>") (emphasis added).  See, e.g, Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997) (finding that "[n]othing in the ADA itself or its implementing regulations dictates that a disabled individual must be provided with the <u>type</u> of auxiliary aid or service he requests" if there is an alternative that provides effective communications) (emphasis added and omitted);[11] Loye v. Cty. of Dakota, 625 F.3d 494, 499 (8th Cir. 2010) (government entity was not required to provide interpreters for plaintiffs at each meeting regarding a disaster response as long as the pertinent information was communicated to plaintiffs); Childers v. Cty. of York S.C., No. C A 0:06-897-CMC-BM, 2008 WL 2563152, at *4 (D.S.C. June 23, 2008) (plaintiff was not excluded from participation in services under Title II when defendant provided "multiple alternative means of delivering the desired service" other than the means sought by plaintiff); Karvelas v. Milwaukee Cty., No. 09-C-771, 2012 WL 3881162, at *5 (E.D. Wis. Sept. 5, 2012) (where medical services sought were available by means other than plaintiffs' preferred accommodation, including different facilities and home visits, failure to make single facility accessible could not provide basis for violation of statutes).  Cf. Alexander v. Choate, 469 U.S. 287, 304 (1985) (Rehabilitation Act does not "guarantee the handicapped equal results").

## B.  Plaintiffs' Claims Are Moot, Meritless or Abandoned

Plaintiffs' claims are moot because Plaintiffs, via the Websites, and other, alternative, means of receiving the information and services sought, have received a reasonable accommodation. Plaintiffs' witnesses, counsel, and expert admit that many of the online services and documents that

---

[11] Burkhart interpreted 28 C.F.R. § 35.160(a), which provides that:  (1) A public entity shall take appropriate steps to ensure that communications with applicants . . . are as effective as communications with others.

are the subject of this suit could readily be used by them. Moreover, SBOE and DMV now also provide a variety of effective, alternative, accessible ways to receive these same services.

Under Article III of the Constitution, the exercise of federal jurisdiction "depends on the existence of a case or controversy, and a federal court lacks the power to render advisory opinions." U.S. v. Leon, 203 F.3d 162, 164 (2d Cir 2000) (quoting and citing U.S. Nat'l Bank v. Independent Ins. Agents of Am., Inc., 508 U.S. 439 (1993)).[12] A claim for injunctive and declaratory relief is moot when the plaintiff "can no longer obtain any legally cognizable benefit from the declaratory and injunctive relief it seeks." Parkway Hosp. v. Shah, 460 F. App'x 21, 23 (2d Cir. 2012). "Thus, 'if an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, we must dismiss the case' as moot." Dessaint v. Lignel, 584 F. App'x 30, 31 (2d Cir. 2014) (quoting United States v. Blackburn, 461 F.3d 259, 261 (2d Cir. 2006)).

Plaintiffs have been afforded accommodations that are "plainly reasonable." To the best of their abilities, DMV, SBOE and ITS have made the functions and documents sought by Plaintiffs available to Plaintiffs, online and otherwise, and Plaintiffs' claims are therefore moot for four overarching reasons. First, as explained at length in the Report of Jonathan Avila, Defendants' expert witness in this matter, each of the functions and pages and forms alleged to be inaccessible in the TAC are accessible: a blind or visually impaired person has the "practical ability. . .to readily and successfully navigate" each specified "webpage, function or document." See Avila Decl. Ex. A at 2.

Second, the same functions, webpages and documents challenged here as inaccessible are also available by email request, by telephone, or by another alternative accessible means, usually an

---

[12] A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000); Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996). Thus, Plaintiffs bear the burden of demonstrating ripeness and standing. See, e.g., Marchi v. Bd. of Coop. Educ. Servs.,173 F.3d 469, 478 (2d Cir. 1999).

electronic one.  See Dkt. 87 at 4-5 (finding no likelihood of success on issue of lack of meaningful access where online transaction could also be performed on the telephone and in person).

Third,  Plaintiffs' own testimony, interrogatory responses and expert report, indicate that the website functions at issue both before the filing of the TAC, and more recently, provide the meaningful access required.  In particular,  Plaintiff's expert does not discuss many of the pages and functions complained about in the TAC,  thereby conceding their accessibility.  Plaintiffs, in response to Defendants' contention interrogatories, relied solely on their expert report to identify all remaining accessibility issues with the Websites.   Defendants' Contention Interrogatories, Dkt. 141 Ex. A (and the Court's Order, Dkt. 142), directed Plaintiffs to "[i]dentify the portions" of the Websites "you contend to be currently inaccessible to the blind or visually impaired in violation of Title II and/or Section 504." (Interrogatories 3 and 7).  In their response to these interrogatories, Lerer Decl. Ex. J, Plaintiffs incorporated their expert report by reference; averring that the "[r]esponsive Portions of the websites are identified in Sharron Rush's Expert Report."  Id. Accordingly, any portion or function of the Websites not identified in the Rush Report is no longer the subject of this action. See 56.1 ¶ 202 (Rush did not include some functions she could utilize successfully in her report).

Fourth, with regard to many of Plaintiffs' claims relating to the inaccessibility of specific forms, functions or information that Plaintiffs claim (in the TAC or in deposition testimony) is inaccessible to them, DMV and BOE have created, and continue to maintain, a website function, document or form in two (or more) different versions.  That is, Defendants now provide electronic access to the service or information via at least one alternative method to the method Plaintiffs claim is inaccessible—and, as set out above, also may provide telephone access and other alternative means of receiving the service.  As explained by Jonathan Avila, under the 508 Standards, and also the WCAG 2.0AA standards, which  Plaintiffs seek to enforce via this lawsuit,  an accessible means

24

of accomplishing the same task online renders a website compliant with 508 and WCAG 2.0AA in regard to the relevant function, even if another version of page or function remains inaccessible. Avila Rep. 14-15.  This principle is consonant with the broader rules for program and service accessibility discussed in Point I(A).[13]

Applying these analyses to each of the functions, forms or documents on the Websites that Plaintiffs claim in the TAC they at one time tried to use and were inaccessible, demonstrates that each such claim is either meritless or moot (or should be deemed abandoned).[14]

1.  **SBOE fillable voter registration application**.  Voter registration application forms are available from SBOE online, by mail, and by telephone request.  56.1 ¶¶ 103-06.  They are also available from numerous other State agencies (including DMV, via <u>two</u> separate online transactions no longer challenged by Plaintiffs).  See <u>id.</u> ¶ 102.  Moreover, SBOE maintains not only a fillable PDF form (which was provided to an outside vendor, Word Wizards, in 2017, to reformat to promote  accessibility, but also the fillable HTML form that can be converted to a PDF for signature, or even submitted in HTML format (signed or unsigned).  <u>Id.</u> ¶¶ 105-07. This form was created as part of the stipulation settling the motion for an injunction in this matter. Dkt. 47.  And although Plaintiffs apparently contend that the data entered by a user on the HTML form does not export to the PDF completely, <u>see</u> Rush Rep. p. 10, neither Plaintiffs nor Ms. Rush, despite the Court's express instruction to do so, provided the date on which the form was tested.  As such, the Court can not only accept the testimony of Tom Connolly that the form now populates properly, but it can take judicial notice that the form now converts properly and completely (since the form is public).  See [https://www.elections.ny.gov/NYSVoterRegistrationFormEnglish.html](https://www.elections.ny.gov/NYSVoterRegistrationFormEnglish.html). 56.1 ¶ 108.

---

[13] [https://www.access-board.gov/guidelines-and-standards/communications-and-it/about-the-section-508-standards/section-508-standards](https://www.access-board.gov/guidelines-and-standards/communications-and-it/about-the-section-508-standards/section-508-standards); [https://www.w3.org/TR/WCAG20/#cc5](https://www.w3.org/TR/WCAG20/#cc5); [https://www.w3.org/TR/WCAG20/#conforming-alternate-versiondef](https://www.w3.org/TR/WCAG20/#conforming-alternate-versiondef).

[14] The claims relating to functions and forms never used by Plaintiffs, and which they do not allege are inaccessible,  are discussed <u>infra</u> in the section of this memorandum discussing the doctrines of standing and ripeness.

Very simply, regardless of the accessibility of the original fillable form mentioned in the original Complaint, at the time of that Complaint, Plaintiffs can now complete the voter registration application transaction via the fillable HTML form, as well as many other means, and therefore this challenge to the SBOE voter registration function is moot.

**2. The Requests for Voter Information and Public Information (SBOE)**.  Plaintiffs' complaints about these forms relate to the CAPTCHA necessary to submit them. TAC ¶¶ 50-51. However, both requests can be made, as indicated on the same webpage, without a form, and without a CAPTCHA, by email.  See 56.1 ¶¶ 141-42.  Plaintiffs' claim in this regard is without substance.

**3. The Current 2009 HAVA Plan for New York (SBOE).** This document was sent to Braille Works by SBOE for remediation in July of 2017, and found to be accessible by Defendants' Expert.  56.1 ¶¶ 157-58.  No witness has testified that it is inaccessible, nor did Plaintiffs' expert provide the date of her testing. See also id. ¶ 159 (Parker could review HAVA PDFs in June 2017 using OCR technology).  In any event, SBOE has taken steps to ensure all HAVA materials on its website are and will be accessible, and will provide those HAVA materials not located on its website, on request by email or phone, in a user's requested accessible format.  56.1 ¶¶ 157-58, 160-63;   This is a reasonable accommodation. Plaintiffs, if they ever were denied access to such materials, are not now.

**4. DMV's Online Voter Registration Application ("Motor Voter").**  This transaction was replatformed by ITS during 2016 and 2017.  56.1 ¶¶ 74-78. Plaintiffs' expert did not address this function in her report, indicating that Plaintiffs no longer contend it is inaccessible.  This claim is therefore, at a minimum, moot.  56.1 ¶ 199.

**5. The Process to Create a MyDMV Account/Log In**. This, too, appears to no longer be an issue.  See 56.1 ¶ 80 (Parker could log in to MyDMV once she got her ID number, she could

also review the instructions to do so; no claim of inability to log in); ¶ 81 (Jacobs could successfully create MyDMV account); Pl. Interrog. Resp. 1 (barriers have been improved).  See 56.1 ¶ 82 (CAPTCHA on that page is being removed by ITS before the end of this month, October).  Accordingly, if this claim is not now moot, it likely will be before the completion of summary judgment briefing, when the CAPTCHA is removed.

      **6**. **The MyDMV Address Change Transaction.**  Plaintiffs' witnesses were able to successfully perform this transaction.  56.1 ¶ 199 (Parker able to update her address on MyDMV at home in October 2016 using JAWS 16; had no barriers to doing so; Rush admitted MyDMV address change function is accessible);  Pl. Interrog. Resp. 1 (conceding that alleged barriers on this function have been improved).  Moreover, the DMV form for this transaction, the MV-232, has recently been reformatted for accessibility.  56.1 ¶ 36.  And, in any event, this service is also available by telephone.  Id.¶ 68 (Eason attempted to do online address update of non-voter ID online, but the entire website was down, so she dialed 411 for the DMV number, called by phone, resulting in having the transaction performed for her online, which also updated her voter registration information).

      **7. The DMV online application for updating or renewing non-driver identification cards**.  This function's accessibility is also conceded.  This function was not identified in any respect in the Rush Report. See also Pl. Interrog. Resp. 1 (conceding that previously alleged barriers were improved ).

      **8. DMV's Make A Reservation System.**  DMV has created an alternative, accessible version of the Make A Reservation function on the DMV website (a fillable form which can be submitted electronically).  56.1 ¶¶ 61-63.  Plaintiffs' apparent cavil with this form relates to the lack of a labelled field for cancellations.  However, there is never any need to cancel an appointment;

DMV does not expect its customers to do so and, regardless, provides additional means for users of the form to cancel their reservation.  Id. ¶¶ 63-64.[15]

9. **Form MV-44 and ID-44.** (DMV Application For Initial License or ID card).  The MV-44 form, with the ID-44 (which lists the relevant identification requirements) has been remediated by Braille Works, and is available on DMV's accessibility page.  Id. ¶¶ 36-37.  The MV-44 was also found to be accessible by Mr. Avila.  Avila Rep. 17-18.  An HTML page with the identical identification requirements is also located on the website, id. ¶ 8,  and neither Plaintiffs nor their expert contends that the HTML page cannot effectively be used by a blind individual.

10. **Form MV-15** (DMV form to seek one's own, or a third parties' driving records).  This form was provided to an outside vendor for accessibility improvements, posted on September 25, 2017, found by Mr. Avila to be accessible, Avila Rep. at 17-18, and is available on the DMV accessibility page in the improved form.  56.1 ¶¶ 35-36.  Plaintiffs' expert does not state that this form was tested on or after September 25.

11. **DMV "rules and regulation relating to the gifting of cars to family members**." Although it is unclear what Plaintiffs meant by this, DMV has made accessibility improvements to the forms used to transfer title and/or registration (the MV-82), and to just transfer title (MV-82TON), the form plaintiff Carl Jacobsen states he seeks to use (they both provide the same title function).  See 56.1 ¶¶ 31-33.  Plaintiffs have not challenged the accessibility of the MV-82—whose function duplicates that of the MV-82TON, and indeed, all these documents are available on DMV's accessibility page.  See id. ¶ 31-32, 46.  Moreover, there is an HTML page that describes

---

[15]  Plaintiffs have also suggested that the form is difficult to locate.  Even assuming, *arguendo*, that this was once true, the court can take judicial notice that the form is readily located via a number of different routes.  https://dmv.ny.gov/dmv/be-prepared-your-license-permit-or-non-driver-id-reservation; https://dmv.ny.gov/dmv/be-prepared-your-registration-or-title-reservation-0; https://dmv.ny.gov/dmv/be-prepared-your-suspension-revocation-reservation; https://dmv.ny.gov/make-office-reservation.

procedures for transfer of title.  Id. ¶ 43.  Plaintiffs' expert's sole complaint with this HTML page is the diction of the description of how to reach a footnote on the page.  See Rush Rep. 13, Tr. 182-185 (complaining about the language the site uses to describe how to close one of the footnotes on the page – there is no claim that the substance of the page cannot easily be used by blind individuals, or that the footnote does not open and close correctly with a screen reader).  In any event, that word choice has now been revised.  56.1 ¶ 44.

12. **Voter Lookup and Locating Polling Places (SBOE)**.  Several of Plaintiffs' witnesses confirmed that they had no problem using functions to either look up their registration information on the "voter lookup" tool, or locate their polling places (via a link a third party page SBOE provides to New York City voters through the voter lookup).  56.1 ¶ 132 (Parker had no problem looking up location of her polls and checking her voter registration status, Eason had no problem looking up her polling place and elected officials).  See also id. ¶¶ 132 (Sumlin could find out his polling place by calling SBOE on telephone); ¶¶ 129-31 (explaining voter lookup tool).

13. **The SBOE representative look-up.**  This function was, for a time, broken for everyone.  56.1 ¶ 134 (Parker tried to use SBOE representative look up function, but found the website unresponsive; when she tried function with her husband who is sighted, she discovered that the unresponsiveness was for everyone, not related to her use of assistive technology).  It has now been repaired.  Id.

14. **SBOE absentee ballot.**  This form, too, has been sent to SBOE's outside vendor, Braille Works, which has made improvements for accessibility.  It was tested by Defendants' expert, who examined its document object model  and found it to be readily usable.  Avila Rep. 32-33. This version was posted BOE's website on September 29, 2017, 56.1 ¶ 125, and any comments by Plaintiffs' expert relating to this form do not to relate to the current version.

In sum, Plaintiffs cannot show that any of the forms, functions or documents on which they base their claims present "live" controversies or that they have been denied meaningful access to them.  The issues raised in the TAC are moot.

## C. Plaintiffs Lack Standing To Challenge: (1) Website Functions They Have Never Used or Tried to Use,  (2) Website Functions For Which They Are Unqualified, and (2) The Accessibility of the Websites to Persons Using Their Eyes Or Assistive Tools For the Sighted

To establish standing to under U.S. Const. Article III, a party must show "(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief." Lujan v. Defs. of Wildlife, 504 U.S. 555, 590 (1992) (internal quotation marks omitted).   An "injury in fact" is the invasion of  a legally protected interest that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or "hypothetical." Id. at 560 (citations and quotation marks omitted).  A plaintiff's failure to satisfy these standing requirements deprives federal courts of subject matter jurisdiction over the claim. Mahon v. Ticor Title Ins.Co., 683 F.3d 59, 62 (2d Cir. 2012).  The Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (collecting cases) (emphasis in original, quotation marks omitted); see Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012).  In addition, a plaintiff must "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).  Thus, "a plaintiff that 'has been subject to injurious conduct of one kind' does not 'possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which [it] has not been subject.' " Kiryas Joel All. v. Vill. of Kiryas Joel, 495 F. App'x 183, 189 (2d Cir. 2012) (quoting Blum v. Yaretsky, 457 U.S. 991, 999 (1982)) (dismissing claims stemming from injuries allegedly suffered by non-parties).

These requirements for standing and a justiciable claim must also be understood in the context of the standards for Title II and Section 504 claims which emphasize the individual nature of the claim.  The concept of a "reasonable accommodation" on which a cause of action is based is an individual one.  It requires an examination of the particular accommodation requested in the context of a particular user's needs.  "[T]he ADA was enacted to eliminate discrimination against 'individuals' with disabilities."  PGA Tour, Inc. v. Martin, 532 U.S. 661, 688 (2001) (emphasis added).  As such, under Title II, when a plaintiff claims that he or she  has been discriminated against because he or she has been denied a "reasonable accommodation,"  the Plaintiff should show that he or she has injury-in-fact caused by the failure to grant him a reasonable accommodation to his specific disability.

In addition, to state a claim under either Title II or Section 504, the individual allegedly discriminated against must "meet[] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131 (Title II); 29 U.S.C. § 794 (Section 504 extends to any "otherwise qualified individual with a disability"); McElwee v. Cty. of Orange, 700 F.3d 635, 643-44 (2d Cir. 2012) (dismissing Section 504 and Title II action because plaintiff not "otherwise qualified"); Johnson v. Randle, 451 F. App'x 597, 600 (7th Cir. 2011) (collecting cases and holding plaintiff could not state claim for discrimination in program because he was not qualified to participate in that program).  Thus, if the specific party seeking to assert a claim that a service is not accessible is not actually qualified to receive that service, or seek that service, he or she would have no injury-in-fact from the lack of that service, and therefore cannot make a claim related to the lack of a reasonable accommodation–this is true not only as a matter  of standing because of lack of a "certainly impending" injury, but also because such allegations fail to state a claim under the applicable statute.

31

Plaintiffs attempt to raise claims relating to services no Plaintiff or witness has ever tried to use or is qualified to use, see Statement of the Case Point (D) (3) (listing hypothetical claims). Plaintiffs lack standing to challenge these Website functions.  They cannot show an imminent injury-in-fact, rather than one which is conjectural and hypothetical.  For example,  Plaintiffs seek to challenge the current versions of the initial voter registration application ("Motor Voter").  But no Plaintiff in this matter will ever use this form to register to vote because they are all already registered to vote. 56.1 ¶ 207.

Plaintiffs similarly lack standing to challenge the non-driver ID renewal function.  The only two witnesses who allege that they attempted to renew their non-driver IDs online conceded at their depositions that they were not in fact eligible to renew their non-driver IDs.  56.1 ¶ 200.  Individuals are eligible to renew a year before expiration, but no sooner.  https://dmv.ny.gov/id-card/renew. Moreover, any individual who attempts to do so at the incorrect time will be prevented from doing so once the first screen is filled out, and informed that the transaction is not available for this reason.  56.1 ¶ 200.  Accordingly, Plaintiffs lack standing to raise any claim relating to DMV's online renewal options.

Carl Jacobsen, another of Plaintiffs' witnesses, the only witness on this subject, testified he sought to use the MV-15 DMV form, which permits individuals to receive the driving records of third parties in very limited circumstances, because he was curious about his driver's safety record. 56.1 ¶ 208.  This, however, is not one of the permitted reasons for use of this form, which generally relates to specified government, law enforcement, statistical and business uses. 56.1 ¶ 34.  Because Mr. Jacobsen, the only witness who alleged he tried to do so, was not qualified to use this form (and indeed, it appears that none of the Plaintiffs' witnesses would have been qualified), Plaintiffs lack standing to assert an injury resulting from his inability to request such records.

Further, there is no Plaintiff who has standing to assert claims relating to the accessibility of the Websites using technology other than screen readers (i.e. technology such as JAWS that reads text aloud). Over the course of discovery, it became clear that none of the barriers Plaintiffs allege that they have encountered in the TAC consist of issues relating to the use of the Websites by individuals with low vision, who use technology to enhance contrast, or make text larger. See Avila Rep. p. 13 (discussing some of the technology used by individuals with low vision, and how it is used). The sole witness who claims to be able to read electronic content using his vision chose not to use his vision in navigating the websites, even after allegedly encountering issues with his screen reader. 56.1 ¶ 209 (Jacobs checked change of address form only with screen reader because that is what he had been asked to check by NFB New York President Carl Jacobsen).[16] Thus, because Plaintiffs have not been subject to "injurious conduct" caused by any alleged failure to make the Websites accessible to those who read them with their eyes, or use a technology to enhance their ability to physically see the Websites, they have no standing to pursue such claims. Kiryas Joel, 495 F. App'x at 189.

**D. Plaintiffs' Claims Based On The Alleged Inaccessibility of Transactions They Have Not Attempted, and May Never Attempt, On Websites That Are Being Continually Revised, Are Unripe**

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quotation marks omitted). In determining whether an action is ripe, a court considers (1) the fitness of the issues for judicial review and (2) the injury or hardship to the parties of withholding judicial consideration. Connecticut v. Duncan, 612 F.3d 107, 113 (2d Cir. 2010) (citing Abbott Labs

---

[16] Similarly, CIDNY and NFB must show injury to members/constituents (which they have not for reasons discussed above) or that they have expended resources assisting persons attempting to use the Websites with their vision in order to have standing to raise this claim. See N.Y. State Citizens' Coal. for Children v. Velez, 629 F. App'x 92, 93 (2d Cir. 2015) (describing standard for organizational standing). But these Plaintiffs, too, have not demonstrated direct injury to themselves because none of the individuals they allege to have expended resources helping have encountered issues with the Websites related to their ability to see the page with their eyes.

v. Gardner, 387 U.S. 136, 148-49 (1967)).[17] Whether an action is "fit" for determination turns on whether "consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to [apply and/or] enforce" the law at issue.  Nutritional Health Alliance v. Shalala,144 F.3d 220, 225 (2d Cir. 1998).  Accord Texas, 523 U.S. at 300-01.  If further factual development would facilitate the legal analysis and prevent the possibility of an advisory determination, the court should, at a minimum, decline to exercise jurisdiction as a prudential matter.  Nat'l Park Hospitality Assoc. v. Dep't of Interior, 538 U.S. 803, 811-12 (2003). Davis v. Kosinsky. 217 F.Supp.3d 706, 708, 712-13 (S.D.N.Y. 2016) (challenge to election laws by potential non-partisan candidate to be a delegate to the Constitutional Convention was unripe where it was contingent on future events that might not occur).  "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship."  Simmonds v. INS, 326 F.3d 351, 360 (2d Cir. 2003).  See, e.g., Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733, 735-37 (1998); see esp. Mcinnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 71-73 (1st Cir. 2003) (claim by woman who hoped to become pregnant, but was not, seeking to challenge wheelchair accessibility of hospital birth recovery area was not ripe; although issues were clear-cut, there were too many contingencies with regard to how and when the facts underlying the claim would eventually develop).

Under this standard, any claim relating to a witness's hypothetical future use of the Websites, unaccompanied by testimony by any Plaintiff or witness that he or she attempted the function at issue and could not use it (or, in many instances, that such a function is even available on the

---

[17] Both aspects of the inquiry "involve the exercise of judgment, rather than the application of a black-letter rule." Connecticut, 612 F.3d at 113 (citing Nat'l Park Hospitality Assoc., 538 U.S. at 814). The basic question before the Court in the context of a determination of ripeness is whether "[plaintiffs'] claims would better be heard now or at some point in the future." Simmonds v. INS, 326 F.3d 351, 359 (2d Cir. 2003) (emphasis omitted).

Websites at issue) are unripe, if they could state a claim at all. See Statement of the Case, (D)(3) (listing testimony relating to such issues).  There is no injury, and no hardship from withholding a judicial determination at this time.  Similarly, any new issues relating to website functions or services first identified in the expert report are also unripe.  Through the efforts of several State agencies, the Websites have been updated, and are and will be undergoing an ongoing process of modernization and improvements, including replatforming and testing for accessibility.  By the time these individuals use such functions and pages, the Websites will not be identical to previously existing versions, and the available functions and pages may well not be the ones presently available (or the ones opined on by  Plaintiffs' or Defendants' expert).  To consider such functions in the abstract, when no witness avers that he or she has a current need to use them or has been unable to use those functions (some of which do not even exist) is unnecessary and inappropriate—it would settle no real-world question, and amount to the proverbial waste of judicial resources. .

## II.    PLAINTIFFS CANNOT USE THEIR EXPERT REPORT TO RAISE NEW CLAIMS

The Rush Report raises a variety of claims and so-called "barriers" that were not pled, and not disclosed during fact discovery, and of which no Plaintiff or witness has complained in this litigation.  In this situation, not only are those claims unripe, but they fail because Defendants received no adequate notice.  Oliver v. Ralphs Grocery Co., 654 F.3d 903, 909 (9th Cir. 2011) ("only disclosures of barriers in a properly pleaded complaint" can provide adequate notice under Rule 8; "a disclosure made during discovery, including in an expert report, would rarely be an adequate substitute"); Coppi v. City of Dana Point, No. SACV111813JGBRNBX, 2014 WL 12589639, at *8 (C.D. Cal. Feb. 24, 2014) (where complaint did not raise issues with accessibility later identified for first time in expert report, notice to defendant was insufficient, and such claims were dismissed); see also Panzica v. Mas-Maz, Inc., No. CV 05-2595 ARL, 2007 WL 1732123, at *8 (E.D.N.Y. June 11,

35

2007) (plaintiff precluded from making claims regarding alleged barriers to access first identified following the close of fact discovery).

The Rush Report contains everything from complaints about the double labelling of an image of a voting machine (on a SBOE webpage never before mentioned), see id. Appendix B, p. 12, to fanciful references to DMV requirements and practices that do not exist.[18]  For example, with regard to SBOE, the Rush Rep. focuses on such items as the district map (contained in the representative lookup tool), raw election result data, and county participation spreadsheets, none of which the Plaintiffs identified in the TAC or their depositions as functions or services that they believed they had been denied.  Rush Rep. at 5-8. The Rush Rep. even focuses on unofficial election night results, id., p. 8, item 13, despite the fact such results are not now posted on the SBOE website at all (that function is being worked on in anticipation of the upcoming election).  See 56.1 ¶ 137. The Rush Rep. also opines on versions of the PDF forms that apparently predate the current ones on the website.  p. 12, item 4, and p. 15, item 18.  Further, to the extent the report focuses on the DMV Home Page, something, again, not mentioned in the TAC or depositions, it virtually ignores the accessible alternative all text home page, which contains all the same text and substance.  p. 13, item 10.  Compare Avila Rep. at 19 (describing DMV text-only alternative home page, and finding it to be fully accessible).  See also Rush Rep. Tr. 24 (admitting all text home page is accessible).  As

---

[18] For example, Ms. Rush objects at length, among other things,  to labelling a button "blue button" rather than "button,"  Rush Tr. 188-89;  adding a single extra step (for all users) in accessing certain registration forms, Rush Tr. 18-21,  having a  label on an image read twice (so it said "image image," rather than just "image," Rush Report App B at 12; failing to include a cancellation line on a form for DMV services which does not require cancellation and admitting that she had no knowledge of practices in this regard.  Rush Tr. 223-24.  She also complains that the BOE HTML convertible voter registration form is not numbered in the exact same manner as the PDF registration form, so that if an applicant called SBOE for assistance, and SBOE asked for information relating to number of the question at issue, the transaction would be more difficult, but again admitted that she had no knowledge of whether or not SBOE telephone operators ever refer to questions on the HTML form (which is not numbered) by number.  Rush Tr. 157-158.  None of these items identified in her report, whether alone or in combination, could conceivably—as a simple matter of common sense—deprive a user of "meaningful access" to information or a transaction.

such, this report appears calculated not to focus the issues in this litigation, but instead to confuse any reader seeking to identify the remaining issues, and thereby expand the litigation and complicate its resolution.

Moreover, Plaintiffs referenced the Rush Rep. in lieu of a response to the contention interrogatories asking them to identify the portions of the Websites they believe violate Title II and Section 504.  Pl. Interrog. Resp. 3, 7.  The Court obviously directed Plaintiffs to answer these interrogatories with the expectation that responses would define and narrow the issues—whether for settlement purposes or otherwise.  Dkt. 142 at 3.  The Court also instructed Plaintiffs to choose a date upon which to base their responses—permitting the parties to actually understand what specific state of the Websites the responses related to.  Plaintiffs, however, virtually ignored this instruction, instead referring to an expert report giving broad "date ranges" from which it is impossible to determine the dates on which any observations were made.  It is therefore of little assistance in defining and narrowing the issues.  Contention interrogatories are "designed to assist parties in narrowing and clarifying the disputed issues in advance of summary judgment practice or trial."  Erchonia Corp. v. Bissoon, No. 07 CIV. 8696 DLC, 2011 WL 3904600, at *8 (S.D.N.Y. Aug. 26, 2011), aff'd, 458 F. App'x 58 (2d Cir. 2012) (quotation marks omitted). Plaintiffs' expert report does precisely the opposite of what it is required to do.  Plaintiffs' expert report, which was submitted in lieu of interrogatory responses, therefore, should not be considered at summary judgment, to the extent it attempts to raise new issues about services, pages and documents never previously pled.  See id. at *5, *7-9 (refusing to consider arguments based on plaintiffs' contention interrogatory responses in summary judgment motion because plaintiff had improperly attempted to use its responses to raise new claims not contained in the complaint).

### III.   REQUIRING DMV OR SBOE TO EXPEND FUNDS ON SYSTEMS THAT SHOULD BE REPLACED, OR HISTORIC PDF DOCUMENTS WITHOUT ELECTRONIC ORIGINALS, WOULD AMOUNT BE AN UNDUE BURDEN OR  FUNDAMENTAL ALTERATION

Even if a plaintiff proves a prima facie violation of Title II or Section 504, which Plaintiffs here cannot because the claims they have pled are moot, there are limits on the accommodation he or she may seek, based on an analysis of the hardship, including expense, that the requested accommodation would impose on Defendants.  Powell, 364 F.3d at 88.  In considering whether a requested accommodation amounts  to undue burden or a fundamental alteration, courts should not consider the resources potentially available to provide the requested relief in a vacuum, but also must take into account "the resources available to the state and the needs of others" served by those resources.  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 607 (1999).[19]  In other words, a defendant is not required "to do whatever it is legally capable of doing to accommodate the plaintiffs" if doing so materially weaken its abilities to serve the remainder of the public.  Onishea v. Hopper, 171 F.3d 1289, 1304 (11th Cir. 1999) (en banc). Moreover, "the relevant budget of the public entity under Title II is the budget for the service, program, or activity at issue."  Pascuiti v. N.Y. Yankees, 87 F. Supp. 2d 221, 224 (S.D.N.Y. 1999). That is, the analysis must relate to the funds in the agency's budget for the given service or program.

Several of the services that are the subject of the TAC in this matter cannot now be made accessible in the manner sought by Plaintiffs without imposing an undue burden, or fundamental alteration of the service, on the relevant agency.  Updating DMV's Make A Reservation system, which is at end of life, and is slated for replacement, would cost more than the entire yearly

---

[19] Although the Court interpreted an ADA regulation regarding "fundamental alteration," it explained that the "fundamental alteration" requirement is consistent with the "undue hardship" requirements set forth in the Rehabilitation Act.  Id.at 606 n.16.

discretionary funds of the agency, would be foolish and uneconomical, and would prevent DMV from funding and maintaining other essential public services.  56.1 ¶¶ 54-60.  In these circumstances, DMV properly created an alternative, accessible online form that provides the same function, until such time as the system is replaced. Similarly, SBOE's voter registration database, and other databases, require replacement, and their replacement is planned. Nonetheless, individual plaintiffs who tried to use such tools said they could do so, see 56.1 ¶¶ 132-33 (voter lookup and polling place for Parker and Eason, representative lookup for Sumlin).  Moreover, attempting to significantly reprogram these tools could easily result in the failure of the entire system, altogether depriving the public of those services.  Id. ¶¶ 182-83.  Further, SBOE's PDF and Excel documents containing tallies of raw vote data are cumbersome historic documents that SBOE cannot reformat without diverting limited funds from critical projects. Id. ¶ 164, 167-69, 193-97.  SBOE is nevertheless taking steps to ensure that going forward such documents will be provided in an accessible manner.  Id. ¶¶ 165-66, 198.  In these circumstances, the accommodation afforded Plaintiffs, providing an accessible reservation form, individual documents, and search results  in accessible format when requested, is more than reasonable.

## IV.     THERE ARE NO GROUNDS FOR INJUNCTIVE RELIEF

Even if Plaintiffs could successfully prove a viable claim for a declaratory judgement regarding their lack of "meaningful access" to any service provided on Defendants' Websites, which they cannot, they would not be entitled to an injunction. It is elementary that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 32 (2008).  Thus, "a court of equity will not enjoin one from doing what he is not attempting and does not intend to do."  Menendez v. Saks & Co., 485 F.2d 1355, 1375 (2d Cir. 1973), rev'd on other grounds, 425 U.S. 682 (1976) (citations and

quotation marks omitted).[20] To establish standing for injunctive relief under Title II, a plaintiff must demonstrate a likelihood that it will be subject to a "'real and immediate threat of <u>future</u> injury.'" <u>Bernstein v. City of New York</u>, 621 Fed. Appx. 56, 57 (2d Cir. 2015) (quoting <u>Shain v. Ellison,</u> F.3d 211, 215-16 (2d Cir. 2004)).  This basic requirement to obtain injunctive relief is well settled, as is the proposition that past injury—such as supposed past exposure to discrimination—is insufficient to confer such standing. <u>Id.</u>;  <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects"); <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105-106 (1983); <u>Williams v. City of New York</u>, 34 F. Supp. 3d 292, 295-96 (S.D.N.Y. 2014).  Additionally, when a party seeks to enjoin a government agency, it "must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs."  <u>Rizzo v. Goode</u>, 423 U.S. 362, 378-79 (1976) (quotation marks omitted).

  Defendants and ITS have been, and continue to be, committed to ensure the accessibility of the Websites, and have continued to improve those Websites, with a particular focus on accessibility.[21]  There is no reason for the Court to exercise its discretion to order Defendants to do what they are already doing.  To the extent Plaintiffs themselves, who know little about the Websites or the scope of services offered by DMV or SBOE, would like to supervise, or impose terms on that process, they have rnot  pled, and cannot establish, a factual basis for such relief.

---

[20] <u>See also</u> <u>Robert Stigwood Grp. Ltd. v. Hurwitz</u>, 462 F.2d 910, 913 (2d Cir. 1972) (injunction should not issue where no evidence of planned future violations); <u>M-F-G Corp. v. EMRA Corp.</u>, 817 F.2d 410, 411 (7th Cir. 1987) (district court appropriately withheld injunctive relief "on the strength of [defendant's] promise" not to continue challenged conduct).

[21] To be sure, changes to the Websites were made after the filing of this lawsuit.  Plaintiffs never fully delineated their concerns prior to suit. In the case of the SBOE, they abruptly refused to engage in further discussions after the SBOE refused to sign a last-minute agreement; in the case of DMV, Plaintiffs chose to sue first and ask questions later. Thus there is every reason to believe that Defendants, and ITS, via its state wide initiative now going forward, will continue their work on website accessibility, even in the absence of an injunction.

A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  Any analysis of these factors indicates that the mandatory  injunction sought by Plaintiff is neither necessary nor appropriate.  First, there is no showing of the "certain and imminent harm" necessary for a finding of irreparable harm.  Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd., 339 F.3d 101, 113 (2d Cir. 2003); see also Lincoln Cercpac v. Health & Hosps. Corp., 920 F. Supp. 488, 496 (S.D.N.Y. 1996) ("[N]o case law has been found to support the idea that merely alleging violations of the ADA and Rehab Act, without more, establishes irreparable injury.")  In fact, not one of the Plaintiffs' witnesses has indicated that he or she suffered any form of real harm; all are registered to vote, and at deposition not one Plaintiff made any immediate claim of a need to use the Websites that amounts to "imminent harm."  In fact, four of Plaintiffs' seven witnesses admitted that they accessed the websites solely for purposes of supporting Plaintiffs' lawsuit, rather than because of current need for any specific service or information offered online.[22]  There is no factual basis in the record for any argument related to imminent harm.

---

[22] Carl and Mindy Jacobsen, who navigated DMV's renewal and reservation applications despite having no ID eligible for renewal, admitted that they logged onto the websites because of this lawsuit.  56.1 ¶ 206 (Carl Jacobsen testifying he navigated to DMV website in December 2016 because "I heard we were having trouble with the DMV website.  I thought I would try and go to the DMV website to see what I could see."), id. (Mindy Jacobsen used only one form of assistive technology because she and husband Carl Jacobsen "often do things like that when we are researching something . . . . [I]t was for the sake of the lawsuit . . . ."); id. (Jacobs accessed DMV website at request of Carl Jacobsen asking him to "check out the website"); id. (Sumlin had no reason for looking at components of BOE website other than the lawsuit).  The remaining witnesses either were able to accomplish every transaction they attempted (Eason and Parker), or had no meaningful plans to use the Websites at all (L. Lopez, Plaintiffs' last minute "substitute witness" expressed only the haziest interest in using the Websites for any identified reason beyond renewing her non-driver ID (a function that, as noted above, is no longer challenged by Plaintiffs)).  56.1 ¶ 210.

Second, it follows that the balancing of hardships favors defendants.  Not only can Plaintiffs show no current real-world hardship or injury (in particular because the services they seek are accessible to them via many alternative routes, as set out above, and they have no imminent need for them), but the hardship imposed on SBOE and DMV, by contrast, would be quite real. That is, SBOE and DMV have, as set out in the Gauthier and Connolly Declarations, only limited funds and dedicated staff available to improve the Websites and must, at the same time, maintain the Websites for the use of the public, and complete other critical technology projects.  For example, SBOE must complete its CAPAS/FIDAS project on a compressed timeline in order to assure sufficient funding to complete the project.  56.1 ¶¶ 174-79.

Third, the public interest would not be served by an injunction.   Regardless of the claims in this suit,  BOE, DMV and ITS will continue to respond to any complaints, and to improve the Websites.  Indeed, this is a major New York State initiative—the entire ITS portion of the DMV website is slated for replacement, as is the informational portion of the DMV website via the transition to Drupal 8 for all state executive agency websites.  And all of this will be designed to promote accessibility.  Id. ¶ 98. The ITS replatforming project for the "transactions" portion of the DMV website is ongoing.  Id. ¶¶ 96-97. Similarly, SBOE, after completing the current update of the legally-mandated CAPAS/FIDAS system, plans to update the platform for its database functions. Id. ¶ 181. An injunction requiring Defendants to "fix," or retrofit, the Websites  immediately to address any and all problems caused by old programming, platforms, databases, and archival documents—when all the online services (not just those mentioned in the TAC) provided are available to Plaintiffs by alternative means online, by telephone, in person, and by mail—would be financially wasteful, logistically impossible, and of little value to the public.

      SBOE and DMV have long indicated their willingness to work to assure accessibility of the Websites, and have devoted their resources to doing so.  As such, Defendants' problem with the

Plaintiffs' suit is not Plaintiffs' stated goal of assuring accessibility of these State websites to the Plaintiffs and others.  All the parties, we hope, share this goal.  Rather, this case has revolved around Plaintiffs' hazy and constantly shifting claims, many not founded in any possible need for the services at issue, or in any understanding of those State services, or how they are provided, accompanied by aggressive litigation tactics that appear directed not to resolution of this matter, but to prolonging it.

This suit should proceed no further.  DMV and SBOE have long attempted to ascertain Plaintiffs' alleged problems with the operation of the websites and to address them.  At this juncture there is nothing more for the Court to do.  The claims are moot and the public interest would  be disserved by any remedy that prevents SBOE and DMV from exercising their discretion with the goal of  effectively administering their websites and resources to provide services to the blind and visually impaired and to the remainder of the public.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' claims against them in their entirety with prejudice, and grant any further relief that is deemed to be just and proper.

Dated:  New York, New York
      October 19, 2017

                                Respectfully submitted,

                                ERIC T. SCHNEIDERMAN
                                Attorney General of the State of New York
                                <u>Attorney for Defendants</u>

By:     <u>  Elizabeth A. Forman/s/            </u>
                Elizabeth A. Forman
                Assistant Attorney General
                120 Broadway, 24th Floor
                New York, New York 10271
                (212) 416-8538