UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVA EASON, MEGHAN PARKER,
NATIONAL FEDERATION OF THE BLIND, and the
CENTER FOR INDEPENDENCE OF THE DISABLED,
NEW YORK

                        Plaintiffs,                                 No. 16-cv-04292 (KBF)

             -against-

NEW YORK STATE BOARD OF ELECTIONS, NEW
YORK STATE DEPARTMENT OF MOTOR VEHICLES,
TODD D. VALENTINE and ROBERT BREHM, in their
official capacities as Co-Executive Directors of the Board
of Elections, THERESA EGAN, in her official capacity as
Executive Deputy Commissioner of the Department of
Motor Vehicles, and GREGORY J. KLINE, in his official
capacity as Deputy Commissioner for Administration of the
Department of Motor Vehicles,

                        Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Defendants
120 Broadway - 24th floor
New York, New York 10271
(212) 416-8538

Elizabeth A. Forman
Noam Lerer
Assistant Attorneys General
Of Counsel

November 13, 2017

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ........................................................................................................ 3

POINT I  --   PLAINTIFFS CANNOT CHALLENGE THE WEBSITES WITHOUT
ESTABLISHING THAT PLAINTIFFS LACK "MEANINGFUL ACCESS"
TO A SPECIFIC SERVICE SOUGHT BY PLAINTIFFS AVAILABLE
ON THOSE WEBSITES AND HAVE INJURY-IN-FACT ................................. 3

    A.  Plaintiffs' Motion Must Be Denied Because They Have Not Shown That They
Lack "Meaningful Access" to Any Service Available on the Websites ...................... 4

    B.  Plaintiffs and Their Expert Rely On the Wrong Legal Standard ................................. 7

    C.  Plaintiffs' Attempt to Rely On Unpled, Hypothetical, and Moot Claims
Is Inconsistent With Article III and Notice Pleading Requirements .......................... 11

POINT II  --   PLAINTIFFS' RELIANCE ON PARTIAL, MISSTATED AND
IMMATERIAL FACTS, AND ON THEIR EXPERT REPORT, DOES
NOT ENTITLE THEM TO SUMMARY JUDGMENT ..................................... 13

    A.  The Witness Testimony Relied On By Plaintiffs Does Not Entitle Them To
Judgment In Their Favor ............................................................................................. 14
          Meghan Parker .................................................................................................... 14
          Eva Eason............................................................................................................ 17
          Liliete Lopez ....................................................................................................... 18
          Arthur Jacobs ...................................................................................................... 19
          Dennis Sumlin..................................................................................................... 20
          Carl Jacobsen and Mindy Jacobsen ................................................................... 21
    B.  Plaintiffs' Expert Report Should Be Excluded .......................................................... 24
    C.  Defendants Have Not Admitted The Existence of Any Relevant Barriers................. 26
    D.  Defendants' Policy and Procedures Are Appropriate, and Not Inadequate As
A Matter Of Law .......................................................................................................... 30

POINT III -- PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF ...................... 33

CONCLUSION.................................................................................................... 36

## TABLE OF AUTHORITIES

CASES                                                                      Page(s)

Andrews v. Blick Art. Materials, LLC,
    17-CV-767, 2017 WL 3278898 (E.D.N.Y. August 1, 2017)...................................................5

Bircoll v. Miami-Dade Cty.,
    480 F.3d 1072 (11th Cir. 2007) .........................................................................................9

Folkerts v. City of Waverly, Iowa,
    707 F.3d 975 (8th Cir. 2013) ..............................................................................................9

Gil v. Winn Dixie Stores, Inc.,
    242 F.Supp.3d 1315 (S.D. Fla. 2017) .................................................................................5

Loye v. Cty. Of Dakota,
    625 F.3d 494 (8th Cir. 2010) ..............................................................................................9

Markett v. Five Guys Enterprises,
    LLC, No. 17-CV-788 (S.D.N.Y. July 21, 2017)..................................................................5

Martin v. Metro Atlanta Rapid Transit Auth,
    225 F. Supp. 2d 1362 (N.D. Ga. 2002) ..............................................................................6

McElwee v. Cty. of Orange,
    700 F.3d 635 (2d Cir. 2012)................................................................................................4

Midgett v. Tri-Cty. Metro. Transp. Dist. of Oregon,
    254 F.3d 846 (9th Cir. 2001) ............................................................................................35

NFB v. Lamone,
    813 F.3d 494 (4th Cir. 2016) ........................................................................................9-10

Olmstead v. L.C. ex rel. Zimring,
    527 U.S. 581 (1999)..........................................................................................................35

Onishea v.Hopper,
    171 F.3d 1289 (11th Cir. 1999) (en banc) ........................................................................35

Rizzo v. Goode,
    423 U.S. 362 (1976)..........................................................................................................35

Step By Step, Inc. v. City of Ogdensburg,
    176 F. Supp. 3d 112 (N.D.N.Y. 2016)..............................................................................35

Valanzuolo v. City of New Haven,
    972 F. Supp. 2d 263 (D. Conn. 2013)................................................................................9

Wells v. Thaler,
    460 F. App'x 303 (5th Cir. 2012) ...................................................................................9

Westchester Disabled On the Move, Inc. v. Cty. of Westchester,
    346 F. Supp. 2d 473 (S.D.N.Y. 2004) ........................................................................34

**U.S. Constitution**

Article III ............................................................................................................3, 11

FEDERAL STATUTES

42 U.S.C.
    § 12132 ...........................................................................................................4

Americans with Disabilities Act (ADA), Title II ............................................... passim

Americans with Disabilities Act (ADA), Title III .....................................................5

Rehabilitation Act Title II
    § 504 ..........................................................................................................31, 33
    § 508 ................................................................................................................31

FEDERAL REGULATIONS

28 C.F.R.
    § 35.130 .............................................................................................................8
    § 35.160 ...........................................................................................................8-9
    § Part 35, App. A, § 35.138 ....................................................................................8

45 C.F.R.
    § 84.2 ...............................................................................................................8
    § 84.4 ...............................................................................................................8

Defendants submit this memorandum of law, with the accompanying Rule 56.1 Response ("Def. 56.1 Resp."), dated November 13, 2017, and the Opposition Declarations of Michael Allen, dated November 8, 2017 ("Allen SJ Opp. Decl.") and Thomas Connelly, dated November 13, ("Connelly SJ Opp. Decl.") in opposition to Plaintiffs' Motion for Summary Judgment, and accompanying Memorandum ("Pl. SJ Memo"), filed October 19, 2017.[1]

## PRELIMINARY STATEMENT

Defendants are committed to providing accessible online services to the disabled.  Plaintiffs do not and cannot demonstrate that Plaintiffs lack meaningful access to any service available on the Websites claimed to be inaccessible in the TAC or by Plaintiffs' fact witnesses.  Plaintiffs also cannot show that that they lack meaningful access to any identified service, available via the Websites, which Plaintiffs aver that they may, hypothetically, seek future access to.  Although Defendants believe that claims relating to such functions are not justiciable—because Plaintiffs lack standing to raise them and they are unripe—Defendants have nonetheless made such functions accessible to the blind and visually impaired, as set out in more detail in the declarations in support of Defendants' summary judgment motion.  For this reason, among others, Plaintiffs' claims should be dismissed.  See Def. SJ Mem.  23-30.

Nonetheless, Plaintiffs' position on this motion is that in order to receive an injunction against DMV and SBOE, Plaintiffs need not demonstrate that they currently lack "meaningful access" to any specified "service, program or activity" provided by DMV or SBOE.  Instead, they

---

[1] This memorandum relies on the same defined terms and conventions as Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, dated October 19, 2017 ("Def. SJ Mem.") (Dkt. 155). This memorandum also references Plaintiffs' Memorandum of Law in Support of Their Motion For Summary Judgment, dated October 19, 2017 ("Pl. SJ Mem.") (Dkt. 151), Defendants' Memorandum of Law In Support of Their Motion to Exclude the Expert Testimony of Sharron Rush, dated October, 31, 2017 (Dkt. 159) (" Daubert Mem."); and Defendants' 56.1 Statement in Support of their Motion for Summary Judgment ("Def. 56.1") (Dkt 152-45) .

contend that Court may find that the Websites, as a whole, are inaccessible to blind and visually impaired individuals, based solely on Plaintiffs' past alleged problems using the Websites (some of which relate to the Websites as they existed as long ago as 2008 or 2012), and various undated alleged technical issues identified by their expert, but not complained about in the TAC or by any fact witness. Plaintiffs argue that they are therefore entitled to an injunction requiring Defendants to implement certain far-reaching procedures and policies (many of which are already in place), and ordering ongoing oversight of the Websites and every aspect of their accessibility by the Court.

Plaintiffs' approach is legally flawed and devoid of factual support. In order to challenge the Websites in their entirety, Plaintiffs attempt to alter the legal standard under Title II and instead impose a standard of technical perfection. They also ignore the requirements of injury-in-fact and ripeness and even of notice pleading. However, under Title II and the Rehabilitation Act, Plaintiffs cannot challenge the entirety of the Websites in the abstract; they must show that they or their fact witnesses lack "meaningful access" to functions or services on those sites for which they are qualified, and that they have injury-in-fact as a result.

 In addition, the testimony Plaintiffs rely on to support their claims of inaccessibility, in light of the complete factual record in this matter, does not remotely support a finding in Plaintiffs' favor. Plaintiffs have not shown and cannot show that they do not now have access to any Website service they seek. Further, for the reasons set out in the Daubert Mem. (Dkt. 159), Plaintiffs' expert report, which Plaintiffs seek to rely on to claim that the Websites are currently inaccessible, should be excluded because its purported conclusions and recommendations have no factual basis, and no valid methodology—and do not even map to the applicable legal standard in this case. The scattershot observations of Plaintiffs' expert, untethered to relevant dates, and unaccompanied by any testimony indicating that a blind or visually impaired witness now lacks "meaningful access"

to a Website function or service which he or she has tried to access, does not provide a factual basis for the far-reaching relief requested on this motion.   Plaintiffs' claims with regard to Defendants' alleged "admissions" and policies and procedures are similarly irrelevant, selective and myopic, and do not accurately reflect the actual facts and testimony in this matter relating to the services at issue, including the testimony relating to Defendants' accessibility policies and procedures.   Plaintiffs have not and cannot demonstrate that they are entitled to declaratory relief, never mind the unnecessary and overbroad injunctive relief they seek.

## ARGUMENT

### I.   PLAINTIFFS CANNOT CHALLENGE THE WEBSITES WITHOUT ESTABLISHING THAT PLAINTIFFS LACK "MEANINFUL ACCESS" TO A SPECIFIC SERVICE SOUGHT BY PLAINTIFFS AVAILABLE ON THOSE WEBSITES AND HAVE INJURY-IN-FACT

Plaintiffs characterize their claim on this motion as one that both Websites are inaccessible government "services"—even in the absence of <u>any</u> proof that Plaintiffs now lack meaningful access to any specified function available on those Websites.   Pl. SJ Mem. 4-5 (arguing that the Websites themselves are "services," rather than the functions available on them).   Based primarily on their expert's scattershot and unclear pronouncements, made under the wrong legal standard, relating to various website functions which no fact witness ever testified were inaccessible, they seek to have the Court find that both Websites are entirely inaccessible.   However, Plaintiffs' approach to this litigation: (A) is inconsistent with Title II's requirement that a Plaintiff show a lack of "meaningful access" to an identified government "program, service or benefit;" (B) attempts to impose a standard of technical perfection that appears nowhere in the relevant statutes or regulations; and (C) does not comport with Article III of the Constitution, this Court's orders, or the requirements of notice pleading.

**A. Plaintiffs' Motion Must Be Denied Because They Have Not Shown That They Lack "Meaningful Access" To Any Identified Service Available On the Websites**

There is no legal support for Plaintiffs' position that the Websites—rather than the services available via them—are a government service or program.  Plaintiffs' causes of action under Title II and the Rehabilitation Act in this lawsuit require that Plaintiffs show, inter alia, that Plaintiffs are denied an opportunity to participate in or benefit from Defendants' services, programs or activities, or were otherwise discriminated against based on their disability.  See Def. SJ Mem. 20; 42 U.S.C. § 12132.  A finding of discrimination requires proof Plaintiffs are denied a "reasonable accommodation" that would provide "meaningful access" to Defendants' services, programs or activities.  McElwee v. Cty. of Orange, 700 F.3d 635, 641 (2d Cir. 2012) (quotation marks omitted).  Under this standard, there can be no cause of action for discrimination because, as an abstract matter, certain aspects of the coding of a website are alleged to be less than technically perfect—not unless Plaintiffs or their witnesses can also show that such technical issues on a website denies a real individual "meaningful access" to an identified government service, program or activity for which they are qualified.  See Def. SJ Mem. 19-22.

Plaintiffs nonetheless continue to take the position that a website, rather than the services available via that website, is a government "service" for the purposes of Title II.  This approach is not only inconsistent with Title II, but with the Court's reasoning in denying Plaintiffs' second motion for a preliminary injunction.  As this Court found, an individual who is unable to access a certain government "service" or "program" using a Defendant's website may nevertheless have meaningful access to the service or program through other means. The Court determined that Plaintiffs were not entitled to a preliminary injunction because "plaintiffs have not shown a likelihood of success on the question of meaningful access vis-à-vis change-of-address

4

opportunities" because it was "undisputed that a change of address . . . may be accomplished by telephone call, mail, or an in-person visit."  Dkt. 87 at 4.  That is, the Court correctly recognized that the "service" or "program" at issue was "change of address"—not "website"—and that Plaintiffs had not shown that they were denied "meaningful access" to "change of address procedures."  Id. at 5.  Indeed, the Court, using similar reasoning, dismissed Plaintiffs' previous complaint which also sought to challenge the Websites in their entirety.  See Dkt. 132 at 4-5 (granting motion to dismiss Plaintiffs' claims seeking to expand the litigation to the entirety of both Websites, while granting Plaintiffs leave to replead their specific problems with the Websites as set out in their declarations in opposition to the motion to dismiss).

The cases relied on by Plaintiffs in this regard also do not find that a website, without more, rather than the services available via that website, is a government service or program under Title II.  For example, this Court's decision in Markett v. Five Guys Enterprises, LLC, No. 17-CV-788 (S.D.N.Y. July 21, 2017), denied defendant's motion to dismiss an action brought pursuant to Title III of the ADA on the grounds, inter alia, that a restaurant and its website, may be, under Title III, a "public accommodation," and therefore subject to the terms of Title III of the ADA. [2]  But this holding has no application here.  Title III, the portion of the ADA that relates to private entities, does not apply to Defendants, who are State entities.  Thus the question of whether or not a website is a "public accommodation," and thereby subject to requirements of Title III, has no bearing on the issues here.  By contrast to Title III, Title II of the ADA, the statute at issue, does not use the term "public accommodation" to define the scope of its application.  Rather, Title II applies to

---

[2] Similarly, Andrews v. Blick Art Materials, LLC, No. 17-CV-767, 2017 WL 3278898 (E.D.N.Y. August 1, 2017), held that a website was a "place of public accommodation" under Title III of the ADA.  See also Gil v. Winn Dixie Stores, Inc., 242 F .Supp. 3d 1315 (S.D. Fla. 2017) (denying defendant's motion for judgment on the pleadings, because website along with store could be place of public accommodation, but declining to determine whether Winn–Dixie's website is a public accommodation by itself.)

government "programs, services or activities," as set out above.  See also Def. SJ Mem. 21-22 (Title II's emphasis on "program accessibility" rather than "facilities accessibility" was intended to provide public entities with "flexibility" in the means by which they provide services).  There is no question that the services (for example, providing voter registration applications) offered by Defendants in multiple ways by means of their Websites, as well as by other means (email, telephone and in person), are in fact "programs, services, or activities," and therefore covered by Title II.  As a result, the "public accommodation" cases cited by Plaintiffs are irrelevant here.

The only Title II case cited by Plaintiffs to support their claim that an entire website, rather than the services available via it, is a single "service" or "program," Martin v. Metro Atlanta Rapid Transit Auth, 225 F. Supp. 2d 1362 (N.D. Ga. 2002), does not assist them. That case supports the Court's previously stated (and Defendants') understanding of the law.  That case held that Title II was violated where the proof before the trial court indicated that blind individuals lacked effective access to certain transit schedule information they sought through any means, including because the website on which the schedule was available was admittedly not accessible to screen readers. Id. at 1364-66.  That court explained, however, that alternative means of providing the information at issue, separate from the website, if effectively implemented, would fulfill the requirements of the ADA.  Specifically, the Metro Atlanta Rapid Transit Authority ("MARTA") argued that disabled individuals "can either use MARTA's information telephone number to receive scheduling information or request information in alternative formats through MARTA's Customer Service department." Id. at 1377.  The decision expressly found that, although there were practical problems with how MARTA had implemented these alternative means of schedule access, "[t]hese procedures, if implemented properly, would follow the guidelines set forth in the ADA." Id.  This case, the only Title II case cited in this regard by Plaintiffs, did not hold that a website, as opposed

to the services available through it, is without more, a government "program" or "service" under Title II.  Rather, it squarely supports this Court's previous analysis and application of the law: that the government service provided through a government website must not be denied to disabled individuals, and the opportunity to receive the same service must actually be available by effective means, whether online or elsewhere.

### B.   Plaintiffs and Their Expert Rely On the Wrong Legal Standard

Plaintiffs, by their position on this motion, also seek to reduce the ADA and Rehabilitation Act to the trivial and technical rather than a means of assuring that government services are available to disabled individuals who seek them.  The Rush Report, which is Plaintiffs' primary factual basis for their motion, see Pl. SJ Mem. 13-23, applies a standard that is formulated in various ways, none of which comports with the "meaningful access" standard of Title II and the Rehabilitation Act.  Plaintiffs' expert report opines on "equally effective and equally integrated" access with "substantially equivalent ease of use" and/or "equal user experience."  Rush Rep. at 5. But this is not consistent with the legal standard under Title II.  See Daubert Mem. 8-10, 14-17 (discussing how Rush Report does not assist the finder of fact because it does not apply the appropriate standard, does not apply it to any identified current state of the Websites, and fails even to indicate those instances where Ms. Rush feels that a blind person would be unable, as a practical matter, to use a specific Website function readily).  The failure of Plaintiffs and their expert to apply an appropriate standard to the Website functions at issue as of an identified date, in and of itself, merits denial of their motion for summary judgment.

Moreover, Plaintiffs' position—that Defendants' entire Websites must be technically perfect, provide identical means of access to services to their users, whether they are disabled or not, along with optimal ease of access for its disabled users, before Defendants can pass muster

under the ADA—is also inconsistent with the regulations on which Plaintiffs rely.  See Pl. SJ Mem. 7-8.  Any careful reading of 28 C.F.R. § 35.130 et seq., (and even the other regulation cited in this regard by Plaintiffs, 45 C.F.R. § 84.4, which does not apply to DMV)[3] indicates that the regulations relating to discrimination, like the underlying statutes, are focused on equal "opportunity" to access each specific government service or benefit and on "effective" access to the same government services available to non-disabled individuals—not equal "ease of access," identical means of access, or technical perfection of the means of access.[4]  There is no way to draw from the actual language of the regulations the proposition Plaintiffs seek to support—which is that they can challenge the Websites as a whole, as an abstract matter, claiming a variety of alleged technical "barriers," without showing that Plaintiffs are, as a practical matter, currently denied meaningful access to any service available on those Websites for which they are qualified.

Nor does 28 C.F.R. § 35.160, on which Plaintiffs also seek to rely, dispense with the underlying "meaningful access" standard and require, instead, that Defendants make their websites technically perfect.  That regulation requires "effective communications" with the disabled—it does not require perfect, optimal, or identical communications, or identical means of communication.  Rather, the critical issue is effectiveness—do the communications provide effective access to the same identified service, program or information at issue as to a non-disabled

---

[3] One of the regulations cited, 45 C.F.R. § 84.4(b), does not apply to DMV.  By its terms, that regulation applies only to entities that receive funding from the federal Department of Health and Human Services ("HHS") and to the program and activity so funded.  See 45 C.F.R. § 84.2 (Part 45 applies only to recipients of financial assistance from HHS and to the program and activity that receives such assistance).  DMV does not receive funding from HHS.  Plaintiffs have provided no proof that they do so—this would have been an element of their claim, which they neglected to include as part of their moving papers.  This regulation therefore does not apply.  However, this makes little difference as a practical matter, because both Defendants afford blind individuals both "meaningful access" and "effective" services.

[4] Plaintiffs put particular emphasis on an appendix to the regulations relating to 28 C.F.R. Part 35, App. A, § 35.138, a section that discusses ticketing, something not at issue in this matter.  See Pl. SJ Mem. at 4.  In any event, the language in the cited appendix is fully consistent with SBOE's and DMV's provision of meaningful access to the services at issue in this matter.

individual?  See, e.g., Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1081-82, 1085-87 (11th Cir. 2007) (although communications "may not have been perfect," they were nevertheless effective under ADA and 28 C.F.R. § 35.160); Valanzuolo v. City of New Haven, 972 F. Supp. 2d 263, 274-78 (D. Conn. 2013) (discussing Bircoll at length and finding that communication with deaf arrestee/prisoner was effective even if not perfect).  See also Loye v. Cty. Of Dakota, 625 F.3d 494, 498-99 (8th Cir. 2010) (government entity was not required to provide interpreters for plaintiffs at each meeting regarding a disaster response as long as the pertinent information was communicated to plaintiffs; communication was "effective" under 28 C.F.R. § 35.160 and, by the same token, provided meaningful access to the relevant information); Folkerts v. City of Waverly, Iowa, 707 F.3d 975, 984 (8th Cir. 2013) ("Title II and its regulations require that qualified persons with disabilities receive effective communication that results in meaningful access to a public entity's services") (quotation marks omitted); Wells v. Thaler, 460 F. App'x 303, 312-13 (5th Cir. 2012) (prison not required to provide prisoner with specifically requested screen reading software because provision of a qualified individual human reader to the prisoner provided "effective and meaningful access to the law library").

NFB v. Lamone, 813 F.3d 494 (4th Cir. 2016), the sole case relied upon by Plaintiffs for their reading of  28 C.F.R. § 35.160's language relating to "effective communications" as a mandate that all state government websites provide technically perfect or optimal online communications to the disabled, does not support Plaintiffs' position.  Rather, Lamone confirms that the relevant standard is "meaningful access" (a term that appears only once in Plaintiffs' entire brief, in a quotation from this case).  In Lamone, the  Maryland Board of Elections ("Maryland") allowed all voters to access  and download an absentee ballot online, but did not permit blind individuals to fill out their ballots online prior to printing, signing and mailing them because a

9

readily-available "online ballot marking tool," developed by Maryland itself, had not been certified for use under Maryland law. 813 F.3d at 498-500. Lamone determined that Maryland had not provided the blind the required "meaningful access" to voting by absentee ballot because Maryland had not provided the blind and visually impaired with a way to vote absentee without relying on third parties to make their actual voting choices by marking the ballot (despite the fact that such an online tool was already available). Id. at 505-08. Lamone therefore held that Maryland had violated the ADA with regard to absentee voting because blind people could not themselves cast their votes in private as the sighted could—that is, they could not themselves actually "vote." The Court therefore found that there was no effective access to the state service at issue—voting. But that analysis has no direct application here. There is no dispute that voter registration (and party enrollment) information is public, not private, for all applicants for voter registration. Def. 56.1 ¶¶ 114, 116-17. Moreover, as set out in Defendants' SJ Mem., and below, Plaintiffs have "meaningful access" not only to the services they seek to use (in multiple ways), but also to those services on the Websites (often in multiple ways) by electronic means. There is no way to equate the incursion on effective voting rights considered in Lamone to the current alleged lack of technical perfection of a carefully selected assortment of Website functions (most of which were never even complained about by any fact witness on behalf of Plaintiffs).

Defendants have expended time, money and resources over many years, and will continue to do so, and have successfully provided Plaintiffs "meaningful access" to all the identified Website services to which they sought access —and have often even provided electronic access to these services in multiple ways. This is, by definition, a reasonable accommodation. Nonetheless, because Plaintiffs have no viable claim under the correct legal standard in this lawsuit, Plaintiffs attempt to flee the "meaningful access" standard—and impose a different standard relating to, as

their expert put it "substantially equivalent ease of use" or "equal user experience." Rush Rep. at 5. But this is not the legal standard—"meaningful access" is.

### C. Plaintiffs' Attempt to Rely On Unpled, Hypothetical, and Moot Claims Is Inconsistent With Article III and Notice Pleading Requirements

Plaintiffs' approach in its motion is also inconsistent with the requirements of Article III of the Constitution, as well as the requirements of notice pleading. Plaintiffs often seek to rely on alleged technical defects in the Websites without ever identifying any Plaintiff or fact witness who was qualified to use the specified function or service, and purportedly denied "meaningful access" to that service. Plaintiffs lack standing to raise such claims; they are also unripe.[5] See Def. SJ Mem. 18 n.9, 30-35 (identifying functions challenged in litigation no fact witness was qualified to use or claimed they used, and explaining that Plaintiffs lack standing to challenge such functions; also explaining that Plaintiffs lack standing to challenge Websites on behalf of those who use their eyes to review them); Daubert Mem. 18-19 (identifying, in detail, each function included in expert's report never claimed in the pleadings or by any witness to be inaccessible); Def. Mem. 33-37 (hypothetical claims relating to Website functions never claimed by fact witness to be inaccessible are also unripe).

By the same token, Plaintiffs, in their motion, also fail to account for the effect of the doctrine of mootness on their motion, ignoring the fact that Defendants have, examined and/or improved access to all the Website functions to which Plaintiffs claim they seek access. See Def. Mem. 22-30 (reviewing all factual claims relating to Website functions claimed by Plaintiffs in the TAC and fact discovery to be inaccessible, and explaining how each claim is moot). Moreover, Plaintiffs had notice of the changes to the Websites as of the date of the exchange of expert reports

---

[5] In addition, to the extent Plaintiffs challenge functions that no Plaintiff was qualified to use (for example the DMV MV-15 form, or the SBOE request for voter records, they fail to set out a cause of action. Def. SJ Mem. 31-33.

(October 4, 2017), because Defendants' Expert Report ("Avila Rep.") specified the date testing of Website functions was completed. Avila Rep., App'x D.

Finally, Plaintiffs' attempt to use their motion, yet again, to expand their claims to the entirety of both Websites fails as a matter of notice pleading and fairness.  The Court has rejected Plaintiffs' other, similar, attempt to expand the pleadings because, as here, they were unsupported by allegations specifically identifying the Website functions they claimed to be inaccessible and the individuals who used them.  Dkt. 132 at 4-5.  In the Second Amended Complaint, Plaintiffs attempted to raise claims relating to the entirety of both Websites, rather than specifying the functions they deemed inaccessible, and the individuals who had attempted to use such functions. Dkt. 96.  Defendants moved to dismiss, arguing that the new pleading, to the extent it did not relate to the specific functions previously pled (which solely related to voter registration), or to any identified individuals' experience with other specified portions of the Websites, failed, among other reasons, because Plaintiffs lacked standing to raise such claims. Dkt. 99, 118.  The Court granted the motion to dismiss. See Dkt. 132 at 4-6 ("[H]ere where we have a merger of standing and sufficient allegations regarding relief, we come up short.").  Thus, the Court held that Plaintiffs could not challenge the Websites in their entireties, but rather were required to file a pleading identifying the Website services they deemed inaccessible.  At the same time, the Court granted Plaintiffs leave to replead their new factual allegations, first raised by individual witnesses in their declarations in opposition to the motion to dismiss, in a Third Amended Complaint.  Id.

By this motion, Plaintiffs have again attempted to challenge the entirety of the Websites without timely identifying in a pleading, or any by equivalent means, what functions they deem to be inaccessible.  Plaintiffs rely on new factual claims relating to portions of the Websites never previously alleged to be inaccessible in any regard (and, in fact, in many instances which their fact

witnesses testified they had no problems using).  Daubert Mem. 15-16 (listing instances where Plaintiffs' expert opined on functions which Plaintiffs' witnesses said they could use), 18-19 (listing alleged "barriers" relating to Website functions never mentioned in TAC or ever claimed by Plaintiffs' fact witnesses to be inaccessible).  This is a tactic: Plaintiffs have once again altered their factual claims, have attempted to obscure the fact that the Website functions they claimed were inaccessible are accessible, and, in doing so, seek to complicate and thereby prolong this lawsuit.  Plaintiffs' entire approach is improper, and merits denial of their motion.  See Def. SJ Mem. 35-37 (claims first raised in expert report or in response to contention interrogatories are improper and cannot provide basis for relief).

## II.  PLAINTIFFS' RELIANCE ON PARTIAL, MISSTATED AND IMMATERIAL FACTS, AND ON THEIR EXPERT REPORT, DOES NOT ENTITLE THEM TO SUMMARY JUDGMENT

The evidence, as set out in Defendants' motion for summary judgment, confirms that any complained-of Website's functions are fully accessible to Plaintiffs.  Plaintiffs nonetheless seek to create the impression that the Websites as a whole, if not any identified function raised in the TAC or during fact discovery, are inaccessible based on: (A) their fact witnesses' allegations and testimony about functions on those Websites spanning a time period of at least three years and in one instance relating to the years 2008 and 2012 (and presented in a confusing and piecemeal manner organized by witness, not by Website function, page or service); (B) their expert's repetitious and scattershot observations and vague conclusions about the Websites as a whole (which apply the wrong legal standard, are not founded in identified or current facts, and also largely relate to aspects of functions never pled or elsewhere claimed to be inaccessible in this action); (C) alleged (but non-existent) admissions by Defendants' witnesses relating, in most instances, to Website functions, pages or forms never even identified by Plaintiffs as the subject of their claims in this lawsuit, or to duplicate versions of functions elsewhere fully accessible to

Plaintiffs on the Websites; and (D) claims relating to Defendants' policies and procedures that are legally and factually wrong.  Plaintiffs have therefore not approached the factual showing required to entitle them to judgment in their favor.

Any examination of the actual testimony relating to the functions at issue indicates that the Website functions that Plaintiffs have placed in issue in this matter are currently fully accessible to the blind to the extent that making them accessible does not amount to an undue burden—and, in any such instances, an alternative and equally effective means of accessing the same service has been provided.  See Def. SJ Mem. 23-30, 38-39.

**A. The Witness Testimony Relied On By Plaintiffs Does Not Entitle Them To  Judgment In Their Favor**

As set out below, and also in Defendants' SJ Mem., Rule 56.1 Statement, and Responses to Plaintiffs' 56.1 Statement, Plaintiffs' factual claims raised by this motion fail to justify (separately or together) issuance of a decision in Plaintiffs' favor with regard to any DMV or SBOE service or program.  These claims are considered below, this time seriatim in the order discussed in Plaintiffs' Memorandum of Law:

**Meghan Parker**.  According to Plaintiffs, (1) in June 2015 Ms. Parker was unable to log in to DMV and could not update her address.  Plaintiffs also state that (2) Ms. Parker could not update her address in October 2016.  They also allege that (3) certain Help America Vote Act ("HAVA") documents or plans were inaccessible in 2014 and mid-2017 (shortly prior to Ms. Parker's testimony in 2017).  Pl. Mem. 9-10.

This testimony is immaterial to Plaintiffs' claims because, among other things, it does not relate to the current functions or pages on the Websites.  (1) With regard to the current DMV address change process, Defendants are entitled to summary judgment in their favor because Plaintiffs do not now contend that the address change process is inaccessible—they did not include

any allegations relating to this function in their expert report, or in their contention interrogatory responses, which they relied on to identify remaining alleged problems with the DMV site.  See Def. SJ Mem. at 18-19, 24, 27 (item 6). Plaintiffs' claims in this regard are also misleading and incomplete because they neglect to mention that during October 2016, Ms. Parker (then Ms. Schoeffling) was able to log-in and update her address information independently and successfully (when she used an updated version of JAWS).  Def. 56.1 Resp. ¶¶ 42-43.  Moreover, not only is there an online address change function available on the DMV site, and a telephone option, Def. 56.1 ¶ 68, but there is also a fillable PDF form which has been reformatted for accessibility, the MV-232.  Def. 56.1 ¶ 36.  Nowhere do Plaintiffs or their expert claim that the current version of this fillable form is inaccessible.  See Def. SJ Mem. at 27; Def. 56.1 ¶ 199.  There is no basis for any decision in Plaintiffs' favor on the accessibility of this service.  Rather, this claim should be dismissed.

(2) With regard to signing in to the DMV Website, neither Plaintiffs nor their expert identify anything allegedly inaccessible about the sign-in process, apart from a CAPTCHA on MyDMV (complained about only in their expert report), which has now been removed. Allen SJ Opp. Decl. ¶ 2 (testifying to removal of CAPTCHA).  Plaintiffs' witnesses testified they were able to sign in to the DMV Website, or create a MyDMV account, without problem, including Ms. Parker.  See Def. SJ Mem. 26; Def. 56.1 ¶¶ 79-83.[6]

(3) With regard to the HAVA documents, all the HAVA plans on the SBOE website were sent to an outside vendor for formatting to assure accessibility. Moreover, with regard to the unidentified HAVA-related documents referenced in Ms. Parker's testimony from 2014 (which

---

[6] Plaintiffs' attempt to create an issue of fact using last minute "substitute" witness Liliete Lopez fails in light of her testimony that she did not even know what MyDMV is.  Def. 56.1 Resp. ¶ 58.

relies on inadmissible hearsay and may not even involve documents ever hosted on the SBOE website), such materials are not identified in the relevant testimony—which indicates that they cannot properly be viewed as the subject of a claim in this litigation; Defendants have received no adequate notice of such a claim relating to unidentified documents.  Def. 56.1 Resp. ¶ 44.

In any event, all the HAVA documents now online are accessible.  There are three sets of SBOE-provided HAVA materials on SBOE's Website: HAVA plans from 2003 and 2009 (now reformatted to assure accessibility); HAVA decisions (also reformatted to assure accessibility) and a HAVA Legislative document (now reformatted).  Def. 56.1 ¶¶ 156-58, 160-62; Connolly SJ Opp. Decl. ¶ 2.  Moreover, any other HAVA documents (for example, historic materials not on the SBOE Website) can be obtained on individual request in a user's requested accessible format.  Def. 56.1 ¶ 163.  These are more than reasonable accommodations.

Further, Ms. Parker herself testified that she was able to review the PDF HAVA documents she found on the SBOE Website by using an optical character recognition (or "OCR") function. And although Plaintiffs claim that the OCR computer function does not render all PDF documents sufficiently accessible, in the one case where it was used in this matter, on these HAVA documents, Ms. Parker, the only witness who testified that she used an OCR function, stated that, as a functional matter, she did not have any problem reviewing the relevant HAVA documents in this manner.  Def. SJ. Mem. 26 (item 3); Def. 56.1 ¶¶ 157-63.  Ms. Parker's cited testimony, viewed in the context of her complete testimony, Defendants' current Websites, and Defendants' efforts to assure accessibility, does not support Plaintiffs' claims.  See also Def. 56.1 Resp. ¶¶ 44-45, 66.[7]

_____

[7] Plaintiffs' allegations regarding Parker's future plans are immaterial to the resolution of this motion.  Def. 56.1 Resp. ¶¶ 47-48.

**Eva Eason**  Plaintiffs claim that: (1) in 2016 Eva Eason could not update her address for purposes of voter registration on an alleged SBOE form (that form is no longer available on the SBOE Website) that must be printed to be filled out (a "non-fillable PDF"), or on a fillable PDF; (2) she also allegedly could not change her address on the DMV Website for voter registration purposes. (3) Plaintiffs also claim that Ms. Eason wants to change her name online, and (4) that Ms. Eason experienced some unidentified "problems" accessing some kind of unspecified information in September 2016.  Pl. SJ Mem. 10-11.

The testimony referenced to support these claims, in light of the complete factual record in this matter, does not entitle Plaintiffs to a finding that these Website functions are now inaccessible (never mind the Websites as a whole).  To the contrary, the evidence indicates that they are all readily accessible to the blind.  (1) The accessibility, in 2016, of the "non-fillable" PDF mentioned by Ms. Eason is not material to the issues now presented this litigation because that form no longer exists—it has been replaced by other forms.  See Def. 56.1 ¶¶ 105-111; Def. 56.1 Resp. ¶ 49.  The SBOE online HTML "fillable form," which can be used to change an address for the purposes of voter registration, and converts to a PDF, is accessible.  Def. SJ Mem. 25 (item 1); Avila Rep. 35.  So is the SBOE fillable PDF, which can reached either directly through the website or by converting the HTML form.  Def. 56.1 ¶ 105-08 (describing forms); Def. 56.1 Resp. ¶¶ 50-51 (Defendants' expert found PDF to be accessible; Plaintiffs' expert conceded PDF registration application was "properly tagged and accessible").[8]

(2) With regard to the DMV change of address services, Plaintiffs admit that Ms. Eason, who testified that she understood that part of the DMV Website was not working at that time,

---

[8] The information Ms. Eason does not want to disclose to any third party relating to her party affiliation in connection with a registration application is, by law, publicly available information.  Def. 56.1 ¶¶ 116, 117; Def. 56.1 Resp. ¶¶ 50-51.

successfully updated her address by telephone during 2016.  Pl. SJ Mem. 10; Def. 56.1 ¶ 68; Def. 56.1 Resp. ¶¶ 52-53.  Further, as also set out above, Plaintiffs' expert report and deposition testimony, along with Plaintiffs' Interrogatory Responses, concede that the DMV change of address function is accessible both online and through other means (and Ms. Parker was able to use it, with her screen reader, as set out above, during  2016).  See Def. SJ Mem. 27; Def. 56.1 ¶¶ 36, 67, 199; Def. 56.1 Resp. ¶ 113.  (3)  There is no ability to change one's name on the DMV website for any individual, whether sighted or blind.   Def. 56.1 ¶ 7.  Ms. Eason's other, hypothetical, potential future uses of the Websites are immaterial to the resolution of the claims on this motion.  Def. 56.1 Resp. ¶¶ 55-56.

With regard to (4), Ms. Eason's unidentified "problems" in September 2016, Ms. Eason's testimony was confused; she admitted that she did not recall that event clearly.  The only thing that is actually clear from the record is that Ms. Eason used the DMV voter registration application successfully in September 2016 to update her address (the only transaction there is any indication she actually tried to undertake in September 2016).  Def. 56.1 Resp. ¶ 54.

**Liliete Lopez**   Plaintiffs claim that they are entitled to summary judgment because Ms. Lopez testified (1) that she was unable to open the SBOE voter registration form in 2008 and 2012. She also purportedly testified that (2) she could not renew her non-driver ID independently, using a screen reader, without her sister-in-law's assistance in 2016, or (3) sign up for a MyDMV account.  Pl. SJ Mem. 11.

The actual testimony relied on by Plaintiffs, however, does not raise a material issue of fact relating to the current accessibility of these Website functions.  (1) With regard to any allegations relating to the SBOE website in 2008 and 2012, it is undisputed that the SBOE forms and functions on that Website are not the same as those half a decade or more ago.  Moreover, other witnesses

18

were readily able to do precisely what Ms. Lopez alleges she could not do (successfully open the registration form online).  Def. 56.1 Resp. ¶ 57.  In addition, as set out above, multiple ways to apply to register, and to update voter registration information, are currently accessible on SBOE's Website, including a fillable PDF form, and a fillable HTML form.  Registration application forms may also be downloaded, and requested by telephone and email.  See Def. Mem. 25 (item 1).  See Def. 56.1 ¶ 111.

(2) With regard to the DMV non-driver ID renewal function, Defendants' expert found this function to be fully accessible, and Plaintiffs' expert does not contend it is inaccessible (thereby conceding its accessibility, because Plaintiffs relied on their expert report in their interrogatory responses to identify all portions of the Websites Plaintiffs currently contend are inaccessible). Def. SJ Mem. 27; Def. SJ 56.1 ¶ 199; Def. 56.1 Resp. ¶ 58.  Moreover, once again, other fact witnesses on behalf of Plaintiffs were able to do readily what Ms. Lopez alleged she could not do (successfully activate a link to reach the renewal tool).  Def. 56.1 Resp. ¶ 58.  (3) With regard to MyDMV signup, there is no indication, on a full review of Ms. Lopez's testimony on this subject, that Ms. Lopez even knows what MyDMV is, let alone that she tried to create a MyDMV account. Id.[9]  In any event, the evidence indicates that this function is at present fully accessible.  See Def. SJ Mem. 26-27 (item 5); Def. 56.1 ¶¶ 79-83; Allen SJ Opp. Decl. (CAPTCHA on MyDMV signup, about which Plaintiffs' expert complained, has been removed).

**Arthur Jacobs** Plaintiffs seek to show that no material issue of fact exists relating to the current Websites based on Mr. Jacobs's deposition testimony (1) that, in 2016, he was unable to access certain unidentified PDF documents on SBOE's website.  They also seek to rely on his

[9] Ms. Lopez's testimony regarding her future intentions is, at best, immaterial.  Def. 56.1 Resp. ¶¶ 59-60.

testimony that, (2) in December 2016, Mr. Jacobs could not fill out an online change of address form using a screen reader.  Pl. SJ Mem. 11-12.

(1) Because Mr. Jacobs could not identify the SBOE PDF documents that he attempted to access on the SBOE Website, this claim relating to an unidentified document is not cognizable.  It is improper to rely on, or ask Defendants to disprove, a factual allegation relating to the accessibility of an unidentified Website function or page.   See also Def. 56.1 Resp. ¶ 61. Moreover, to the extent Plaintiffs (2) claim that the DMV PDF change of address form (the MV-232), or the DMV online change of address transactions, are not now accessible, there is no basis for such a finding in the record on this motion.  To the contrary, as explained above in the context of Ms. Parker's and Ms. Eason's testimony, Plaintiffs have admitted the accessibility of the online change of address function, and there is also now an accessible PDF fillable form in this regard, the MV-232, which was reformatted for accessibility by DMV's third-party vendor, Braille Works, and posted on September 25, 2017.  Def. Mem. 27; Def. 56.1 ¶¶ 36, 199; Def. 56.1 Resp. ¶ 63.

**Dennis Sumlin** (1) Plaintiffs seek to rely on Mr. Sumlin's testimony that he could not access a Freedom of Information Law request form and a request for voter information form on the SBOE website in December 2016 because of an allegedly inaccessible CAPTCHA for the forms at issue.  (2)  Plaintiffs also claim that Mr. Sumlin could not read the operative New York HAVA plan, which dates from 2009.  Pl. SJ Mem. 12.

As set out in Def. SJ. Mem. 26, Defendants' 56.1 Statement  ¶¶ 141-42, and 56.1 Resp. ¶¶ 64-65, (1) Plaintiffs cannot demonstrate that the CAPTCHA prevents them from making an online FOIL request to SBOE, or from requesting voter information from SBOE, because both requests can also be made via a live email link on the relevant page, by email, without any CAPTCHA. (2)

Plaintiffs have not shown and cannot show that the 2009 New York HAVA Plan is currently inaccessible.  Def. SJ Mem. 26, Def. 56.1 ¶¶ 157-163, and Def. 56.1 Resp.¶¶ 66, 86.[10]

**Carl Jacobsen and Mindy Jacobsen** Plaintiffs also base their claim that they are now entitled to summary judgment on the testimony of Carl Jacobsen and/or Mindy Jacobsen, who are husband and wife, and whose testimony related to their alleged efforts to access: (1) the SBOE absentee ballot request form; (2) the DMV PDF form to request a third party's driving records (the MV-15); (3) the transaction for renewing a non-driver ID, including the ability to make a "no" choice on a question relating to organ donation; and (4) DMV's "make a reservation" system. Plaintiffs also seek to use Mr. Jacobsen's testimony to support claims about (5) one of the DMV forms, the ID-44, a PDF which lists the requirements for receiving an initial identification document (Mr. Jacobsen characterized this document as containing a list of documentation requirements for non-driver ID renewals, but no such document relating to renewals exists, since no identification documents are generally required for renewals).  Finally, (6) Ms. Jacobsen said she attempted to find some unspecified (and non-existent) regulation about "gifting" of cars to relatives.  Pl. Mem. 12-13.

The Jacobsens' testimony does not entitle Plaintiffs to any factual determination in their favor with regard to the alleged inaccessibility of any aspect of these Websites.  (1)  The SBOE absentee ballot request form was reformatted for accessibility by SBOE's vendor, Braille Works, and was examined by Defendants' expert, who found it to be readily accessible. This version of the form was posted on the SBOE website on September 29, 2017.  Def. SJ Mem. 29 (item 14); Avila Rep. 32-33. Def. 56.1 ¶¶ 125-26.  There is no factual indication in the record that this form, as it currently exists on the SBOE website, is inaccessible.  See also Def. 56.1 Resp. ¶ 73.

---

[10] Mr. Sumlin's future plans are immaterial to the decision of Plaintiffs' motion. See Def. 56.1 Resp. ¶ 65.

The DMV PDF form, mentioned by Mr. Jacobsen, the MV-15, (2) which permits qualified individuals to access third-party driving records, was reformatted for accessibility improvements, and reposted in the improved form on September 25, 2017.  Def. SJ Mem. 28 (item 10); Def. 56.1 ¶¶ 35-36.   Mr. Jacobsen, who sought to use that form for the purpose of "curiosity" about his driver, was not qualified to use it because the form can only be used for limited government, law enforcement and business purposes. Def. SJ Mem. 32; Def. 56.1 ¶¶ 24, 208; Def. 56.1 Resp. ¶ 69. Thus, the claim based on Mr. Jacobsen's testimony relating to a former version of this form fails because it fails to state a cause of action (because Mr. Jacobsen was not qualified to use the form), Plaintiffs lack standing to raise this claim; and even if they had standing, that claim would be moot.

(3) The non-driver ID renewal transaction on DMV's website is now fully accessible, as conceded by Plaintiffs, see Def. SJ Mem. at 27 (item 7); Def. 56.1 ¶ 199.  Moreover, neither Mr. nor Ms. Jacobsen is now qualified to undertake that transaction, because it must be undertaken within the one year before expiration of a non-driver ID.  The Jacobsens are not eligible to renew their non-driver IDs.  Def. 56.1 ¶¶ 200-01.  Def. 56.1 Resp. ¶¶ 70, 77.  In fact, if one is not within one year of the renewal date, he or she could not proceed beyond the log on screen to, for example, the page about organ donation.   In addition, Mr. Jacobsen's testimony to the contrary, the challenged choice on the organ donation page lacks any "no" choice. Def. 56.1 Resp. ¶¶ 70, 77. As a result, the Jacobsens' testimony claiming that they were not able to choose this nonexistent opinion on the organ donor page (which they could not have reached because they are not eligible to renew) cannot be credited.  Thus, there no factual basis for Plaintiffs' claim relating to a current lack of access by the blind to the online ID renewal function, and Plaintiffs cannot claim that they have any injury in fact (because their witnesses on this issue are ineligible to renew), and any such

22

claim is unripe.  Moreover, this testimony lacks probative value because it is wholly inconsistent with the way the Website renew function at issue works.

(4)  In connection with DMV's Make A Reservation system, as set out in Def. SJ Mem. 27 (item 8), DMV has created an online, fillable form which is accessible to the blind, and which, like the Make A Reservation system, permits individuals to choose where and when they would like to visit a DMV office.  Def. 56.1 ¶¶ 61-65.  See also Avila Rep. at 14-15 (conforming online alternative function is acceptable way of dealing with a function that cannot be made accessible under both 508 and WCAG 2.0 AA guidelines); see also Def. 56.1 Resp. ¶¶ 71, 77. Updating the current Make A Reservation system, which is at end of life, to retrofit it for accessibility, would amount to undue burden, particularly because DMV has issued a Request for Information relating to the system's replacement.  Def. SJ Mem. at 38-39; Def. 56.1 ¶¶ 54-60.

(5) The DMV PDF form ID-44, which contains the requirements for the initial issuance of identification documents by DMV (such as a learner's permit or non-driver ID) was reformatted for accessibility, and posted on DMV's website.  In addition, an accessible HTML page containing the exact same identification information is and was also available on the DMV Website.  Def. SJ Mem. 28 (item 9); Def. 56.1 ¶¶ 8, 36-37; Def. 56.1 Resp. ¶¶ 72, 77.  There is no allegation that this HTML page is inaccessible.  Thus, again, this testimony is immaterial and provides no basis for Plaintiffs' claim that the Court must find, at summary judgment, that there is no online access for the blind to the DMV information relating to the initial identification requirements.

(6) Ms. Jacobsen's claim about her desire to review some unidentified rule or regulation relating to "gifting" on DMV's site is inscrutable.  There is no rule or regulation on the DMV Website on this subject.  The document or function to which this claim intends to refer is not clear from the pleading or testimony, and any item sought cannot be recognizably identified.  Moreover,

there is an HTML page that sets out certain rules and procedures for transfers of vehicles—that page is formatted for accessibility, and has been tested by Defendants' expert, and Plaintiffs do not make any meaningful claim that that page is not accessible.  Def. Mem. 28-29 (item 11); Def. 56.1 ¶¶ 31-33, 43-45 (explaining that forms relating to vehicle transfer, and HTML page relating to vehicle transfer, are all accessible); see also Def. 56.1 Resp. ¶ 78.[11]

Plaintiffs have presented their claims relating to their fact witnesses' testimony in a disorganized way that is often highly inaccurate and difficult to follow.  Plaintiffs apparently seek to create the impression that there were many more, and more meaningful, problems raised by Plaintiffs' fact witnesses than there actually were.  All the cited testimony relates to a handful of Website functions that Defendants have made every effort to assure are now fully accessible to the blind and visually impaired (and Defendants' expert confirms that the current versions of those functions are accessible).  Parsing Plaintiffs' claims by Website function, and examining the relevant testimony, makes clear that Plaintiffs have not demonstrated entitlement to judgment in their favor.

## B.  Plaintiffs' Expert Report Should Be Excluded

Plaintiffs rely primarily on their expert's report to support their factual claims relating to the lack of accessibility of the SBOE and DMV Websites.  However, for the reasons set out in Defendants' Daubert Mem. (Dkt. 159), that report is devoid of probative value with regard to the issues before the Court.  The Rush Report, and the opinions expressed in it, should be excluded because, among other reasons:  (1) the report lacks sufficiently specific dates for testing of  the Websites, rendering it impossible to tell what version of the Websites is being opined on, id. 6-8; (2) the standard applied in that report is inconsistent with the legal standard in this matter (since,

---

[11] The Jacobsen's claims regarding future intentions to use the website are once again immaterial at best.  Def. 56.1 Resp. ¶¶ 75-76; 79-80.

as discussed above, the Rush Rep. opines on, for example, "equivalent ease of use" rather than "meaningful access"), id. 8-10; (3) the report is devoid of any explanation of the factual reasoning underpinning its stated methodology and its conclusions do not even apply the purported methodology, id. 10-14; (4) the report does not support its conclusions with fact, does not explain its findings with any clarity, and does not specify clearly when the expert deems an alleged technical problem on the Websites to render that function of the Website inaccessible to the blind (and many of the technical problems identified in the report could not conceivably impede the use of any function or page), id. 14-18; (5) the report opines on factual claims relating to functions never identified in TAC as allegedly inaccessible, and with regard to which no witness ever testified they sought and were denied access, id. 18-19; (6) the report opines on the entire Websites purportedly based on "samples," but the "samples" were purposefully chosen, omitting functions about which the expert could find nothing (however minor) wrong, and the report fails to provide any valid "sampling" methodology, id. 19-22; (7) the recommendations expressed in the report, relating to the entire Websites, and relating to procedures which Plaintiffs seek to have the Court enforce via mandatory injunction, are disconnected from reality. Plaintiffs' expert expressed her ignorance about the actual procedures, scope of the websites, staffing, platforms and technical capacities of the Defendants. Id. 22-24.

The hazy, piecemeal, and often confusing factual claims in Ms. Rush's report are disputed but not material; they cannot be understood as relating to the current Websites, and are devoid of probative value regarding any issue now before the Court. See Defendants' 56.1 Response at ¶¶ 81-109 (responding to individual observations cited by Plaintiffs from the Rush Report). See also Def. SJ Mem. 35-37 (explaining that factual claims relating to Website functions never before claimed to be inaccessible raised for the first time by Plaintiffs via the Rush Report are improper).

### C.  Defendants Have Not Admitted The Existence of  Any Relevant Barriers

Plaintiffs also make a series of claims relating to Defendants' purported "admissions" relating to the existence of barriers to accessibility on their Websites.  However, these assertions mischaracterize testimony, are immaterial, relate to functions that were never alleged to be inaccessible in the TAC or by Plaintiffs' fact witnesses (and which were often never even identified or even mentioned by any of Plaintiffs' fact witness, or even their expert witness), and/or relate to Website functions that Plaintiffs elsewhere admit are accessible to them.  In particular, Plaintiffs make allegations relating to alleged admissions relating to: (1) the SBOE CAPTCHA for its Voter Registration request form (a form used to request that SBOE send a hard copy of a voter registration application by mail); (2) unidentified legacy PDFs located on SBOE's site; (3) unidentified  PDF forms on the DMV site; (4) the DMV change of address function; (5) the "carousel" (or "slider") on DMV's homepage and aspects of that page's  reading order; (6)  the ability to cancel reservations made with the accessible, alternative, DMV make-a-reservation form; and (7) a PDF document relating to voter identification documents, which Plaintiffs allege Defendants' expert testified was not usable by the blind; and (8) SBOE's HTML voter registration application form.  (Pl. SJ Mem. 17-18).

Again, addressing these allegations seriatim, none of these purported admissions has any bearing on the issues in this action, and none, individually or collectively, or considered with the other testimony in this matter, entitles Plaintiffs to judgment in their favor:

(1) The CAPTCHA located on the voter registration application request form (the form used to request SBOE to send a hard copy application form) is irrelevant to the resolution of the claims in this matter because Plaintiffs do not allege, or provide testimony, that any blind

individual sought access to this form, and found it inaccessible.[12]  As set out in Defendants' 56.1 Response ¶ 110, this claim is immaterial because the same voter registration application form is available for download and printing on the same page without a CAPTCHA, and may also be requested by phone or email.  Id.; Def. 56.1 ¶ 111. There are also the two, additional, SBOE online voter registration application forms—the PDF and HTML forms discussed at length above.  Id. ¶¶ 105-108; Avila Rep. 35 (HTML form accessible); Def. SJ Mem. 25 (item 1); Def. 56.1 Resp. ¶¶ 50-51 (PDF form accessible).  Further, hard copy voter registration application forms are available from, literally, dozens of different sources, online and elsewhere.  Def. 56.1 ¶¶ 102-07, 118-21.

(2) With regard to unidentified "legacy" PDFs on SBOE's Website, this testimony is also immaterial to the resolution of this action because Plaintiffs made no allegations in the TAC relating to these unidentified documents.  Plaintiffs do not state that they sought access to any such document, and have not identified those documents in any manner.  See n.12, supra. Further, as testified to by Hope Hardwick, SBOE made efforts "years ago" to make these documents accessible.  Def. 56.1 Resp. ¶ 111.  In addition, as set out in Defendants' summary judgment papers, any "legacy" documents (for example, PDF documents without electronic originals) will be provided in a requested accessible format on individual request.  See Def. 56.1 ¶¶ 156-72 (explaining SBOE treatment of historic PDF documents).

(3) Plaintiffs, very similarly, seek to base their claims on purported admissions related to unidentified allegedly inaccessible PDFs on the DMV site.  Again, however, such claims relating to unidentified documents are immaterial.  Every DMV PDF to which Plaintiffs seek access, as identified in pleadings or in depositions, has been reformatted to assure accessibility to the blind

---

[12] Not only was there no sufficient notice of any claim by Plaintiffs  relating to this form, like the other documents never complained-of by the TAC or Plaintiffs' fact witnesses, but Plaintiffs lack standing to make any claim with regard to this document—Plaintiffs fail to allege or show  that they have any injury relating to this document.  Def. SJ Mem. 30-32.

and visually impaired, Def. 56. 1 ¶¶ 36, along with additional forms potentially useful to the blind and visually impaired, see id. ¶ 37.   The remaining PDF forms on the DMV Website are being reformatted, and will also be provided, in the interim, on individual request, in the user's requested format.  Id. ¶¶ 29-41.  No claims have been raised in this matter at all with regard to these remaining unidentified PDFs.  No Plaintiffs' witness, for example, has previously sought to use the emissions inspector licensing application.  No Plaintiffs' witness even identifies one of these forms he or she may seek to, perhaps, use in the future—so any testimony with regard to them is immaterial.  See n.12, supra.  See also Def. 56.1 Resp. ¶ 112.

(4) Surprisingly, Plaintiffs also claim that DMV admitted that the change of address function was inaccessible.  The testimony cited does not support this claim.  Def. 56.1 Resp. ¶ 113.  Moreover, as also set out above, not only could Meghan Parker use this transaction without problem in October 2016 (as soon as she used an updated version of JAWS), and Eva Eason use a telephone alternative, but Plaintiffs concede the current accessibility of this function.  Rush Tr. 47.  See also Def. SJ Mem. 19, 24, 27 (item 6); Def. 56.1 ¶ 199.

(5)  Plaintiffs' claims relating to testimony concerning the DMV home page are also immaterial and inaccurate.  As explained in Defendants 56. 1 Resp. ¶¶ 115-118, DMV has created an alternative, accessible, text-only home page, with the functionality of the other home page, while the original home page is being replaced (it is slated for replacement later this year, Def. 56.1 ¶ 51).  As set out in the Avila Report, a conforming alternative function is a fully acceptable way of dealing with any potential inaccessibility.  Avila Rep. 18-20.  Moreover, the carousel, or "slider," (a website feature which makes announcements serially, rather than at all once, as text would) of which Plaintiffs complain, no longer operates automatically; it has been disabled.  Id. at 20 n.20.  As such, Plaintiffs' claims in this regard are immaterial, and the testimony they reference

in no way supports their position on this motion.  See also Avila Rep. 19 (opining that text-only DMV home page is accessible); Rush Tr. 184 (admitting text-only DMV home page is accessible).

(6) Plaintiffs also claim that Defendants' expert admitted that the new accessible Make A Reservation form posted online at the end of September is not accessible because it does not contain a field to change or cancel a reservation.  Not only is Plaintiffs' claim about this testimony incomplete and inaccurate, Def. 56.1 Resp. ¶ 118, but it is undisputed that any individual who makes a reservation using that form has the opportunity to cancel or reschedule an appointment, whether by email or telephone, at the number or return email address provided, or by using the form.  Moreover, there is no need or DMV requirement that users cancel an appointment before making a new one. Def. 56.1 Resp. ¶ 118.

(7) Plaintiffs' claim about an alleged admission about an untagged form with identification requirements is also immaterial.  The form shown to Mr. Avila at his deposition is not the same as the current one.  Mr. Avila testified on October 11, 2017; that form was being reformatted to assure accessibility and then reposted on October 17, 2017.  Def. 56.1 ¶ 36.  Moreover, this factual claim is immaterial because the exact same information is and was available at the time on an HTML page on the DMV Website, a page which Plaintiffs have never claimed was or is inaccessible. Def. 56.1 ¶ 6; Def. 56.1 Resp. ¶ 119.

(8)  Plaintiffs  claim that SBOE somehow conceded that its HTML voter application form is not accessible.  Plaintiffs' allegation in this regard is completely wrong—the testimony cited by Plaintiffs does not even relate to the HTML voter application form.  Mr. Avila testified in the cited testimony with regard to a form (also discussed in (1) in this section) to request a hard copy of a voter registration form, not the accessible HTML online voter application (a form which converts to a PDF, and was created in response to Plaintiffs' request in this litigation).  Def. 56.1 Resp. ¶

120.  Moreover, as again stated above, the same voter registration application form is available for download on the same page, and can also be requested by telephone or email.  Id. Def. 56.1 ¶ 111, and is also available in myriad other ways.  Further, again, there are two accessible online versions of the SBOE voter registration application—the convertible HTML form, and the PDF form.  Avila Rep. 35 (HTML form accessible); Def. SJ Mem. 25 (item 1); Def. 56.1 Resp. ¶ 50-51 (PDF form accessible).

The  purported  admissions  relied  on  by  Plaintiffs  mischaracterize  testimony  on  subjects irrelevant to the claims in this action.

### D.  Defendants' Policy and Procedures Are Appropriate, and Not Inadequate As A Matter Of Law

Plaintiffs  also  misstate  Defendants'  accessibility  procedures  and  policies.    Indeed, Plaintiffs  never  claimed  in  the  TAC  that  DMV's  or  SBOE's  policies  and  procedures  were inadequate.  These claims, in fact, do not relate to any causes of action raised in the TAC, and, indeed, Defendants' expert was never requested to testify on this subject, as Defendants did not understand it to be a claim in Plaintiffs' lawsuit.  As such, these factual claims relate exclusively to Plaintiffs' requested injunctive relief seeking to require Defendants to establish certain policies and procedures (most of which are already in place).  Thus, these allegations need not be reached in  any  regard  unless  the  Court  finds  that  Plaintiffs  have  established  their  claims  relating  to declaratory relief —which they have not done, and cannot do.

In any event, Plaintiffs' allegations relating to practices and procedures are not supported by  fact  or  law.    For  example,  Plaintiffs  claim  a  lack  of  an  appropriate  State  policy  relating  to accessibility—but  that  policy,  promulgated  by  ITS,  remains  in  force  and  was  assessed  by Plaintiffs' own expert to be adequate.  Def. 56.1 ¶¶ 85-89; Def. 56.1 Resp. ¶ 128.  Moreover, Plaintiffs apparently take the position that that State policy must impose WCAG 2.0 AA guidelines

in every regard on every website function (including legacy functions and documents) for those websites to conform to the requirements of Title II and Section 504 of the Rehabilitation Act. However, as recognized by the Court, WCAG 2.0 AA, in and of itself, does not supply the applicable legal standard under Title II—rather, "meaningful access" to a government service or program is required.  Def. SJ Mem. 19-22.  Further, even the current, inactive, unpromulgated, regulatory proposal for a new Title II regulation relating to websites would provide agencies two years from any future effective date of that regulation to comply with the WCAG 2.0 AA standard, would exempt from that standard the kind of old, PDF documents that Plaintiffs claim must immediately be made accessible on the SBOE site, and would also provide a continued exception for "undue burden" and "fundamental alteration."  Id. at 4-5.  Similarly, under the recently promulgated regulation under Section 508 of the Rehabilitation Act (which applies to federal entities but does not apply to Defendants), WCAG 2.0 AA applies only to new web content.  Old web content on federal websites is grandfathered.  Id. at 4.  Plaintiffs' (and their expert's) claim that Defendants' policies must treat WCAG 2.0 AA, in all instances, for all functions, as the operative legal standard is devoid of any basis in law or fact.[13]

In addition, Plaintiffs ignore Defendants' actual policies and procedures.  In some instances, they fail to acknowledge the formal policies DMV already has; in other cases, they equate "policy" with formal, written policy, ignoring the actual, long-standing, consistent practices of Defendants and their responsible staff.  For example, DMV's informational website was designed pursuant to an RFP that, pursuant to state policy, required compliance with the state

---

[13] Indeed, it is worth noting that although Plaintiffs' expert apparently uses WCAG 2.0 AA as a stand-in for technical perfection and "equal ease of access," the proposed order prepared by Plaintiffs on this motion does not require conformance with WCAG 2.0 AA—it only mentions WCAG 2.0 AA as one possible measure of accessibility conformance, thereby effectively conceding that there is no legal requirement under Title II that the Websites be maintained, at this time, at WCAG 2.0 AA.  Dkt. 151-35.

accessibility guidelines.  Def. 56.1 ¶ 19.  The Web Services Office ("WSO") of DMV has its own accessibility policy, Def. 56.1 Resp. ¶ 126, and designated accessibility coordinator, Def. 56.1 ¶ 25. The WSO also has procedures in place to check both new postings and existing website content for accessibility.  Def. 56.1 ¶ 24; see also McClenon Decl. ¶ 21 (describing in greater detail that DMV has purchased the JAWS screen reader and two programs that check for accessibility, assesses new content with manual and automatic tools, and continuously performs scans on preexisting content).  WSO staff have also attended an accessibility workshop and taken online accessibility training.  Def. 56.1 ¶¶ 26-27.

ITS, which maintains the transactional portions of the DMV site (with the exception of the outdated Make A Reservation system, which is maintained by a third party contractor), similarly follows the ITS Policy, and has similarly robust testing practices and procedures, as well as a designated accessibility lead staffer.  56.1 ¶¶ 73-77.  ITS utilized these policies and procedures to test for accessibility (including using a screen reader) in the replatforming process of the DMV transactions begun in early 2016.  Id. ¶¶ 74-75.

SBOE, although not formally bound by the ITS Policy, follows it.  Moreover, SBOE has an accessibility coordinator, who was trained on accessibility prior to creating the current website, has access to a JAWS screen reader, and, ever since the creation of the website, has long had procedures to check its site for accessibility, including checking all new content before it is posted and checking all existing HTML pages once a year. Def. 56.1 ¶¶ 142-51.  Plaintiffs' factual allegations in regard to SBOE's and DMV's accessibility procedures, on which they rely, are wrong.  56.1 Resp. ¶¶ 121-50.

Further, to the extent the Plaintiffs rely on their expert's report to claim that, as a matter of law, Defendants' policies and procedures are inadequate, such reliance is misplaced.  As set out in

the Daubert Mem. at 22-24, Ms. Rush's recommendations were founded in virtually complete ignorance of defendants' websites' technology, practices, tools, testing requirements, staffing, scope, resources, or anything else that could have informed her judgment.  Plaintiffs have failed to make any factual showing that any function or service at issue is inaccessible; they also have made no showing that could support a finding that Defendants' current accessibility policies and procedures are so inadequate that the Court should impose additional or different policies or procedures, via mandatory relief, on these State agencies.

## III.  PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

Even if Plaintiffs were to prevail on any claim with regard to the current accessibility of the Websites, which they should not, they have not established any basis for the injunctive relief they seek.   Def. SJ Mem. 39-43.  Plaintiffs have established no irreparable injury. Most of Plaintiffs' witnesses testified that the only reason that they accessed the Websites at issue was to support this lawsuit.  Id. at 41 & n. 22.  Moreover, the balancing of hardships and public interest both favor Defendants, who are required to maintain the Websites for the use of the entire public, and the specific injunctive relief sought by Plaintiffs would compromise the ability of Defendants to provide the Websites' relevant services to the entire public, and to fund their Websites' operations, and other agency functions, for the benefit of the public.  See Def. SJ Mem. 38-39; Def. 56.1 ¶¶ 54-60, 182-83, 164, 167-69, 193-98; Gauthier Decl. ¶¶ 9-16. [14]

Plaintiffs nonetheless contend that they are entitled to injunctive relief on the present record alone because: (1) any denial of any ability to use any aspect of the Websites amounts to irreparable injury; and (2) the "benefit of equal access" outweighs the cost to defendants, particularly given

---

[14] As noted in Defendants' motion for summary judgment, this Court will only need to reach the issue of undue burden if it finds that Plaintiffs have proven a prima facie violation of Title II or Section 504.  Def. SJ Mem. at 38-39.  For the reasons discussed in Defendants' motion, Plaintiffs have failed to make such a showing.

the size of Defendants' total budgets.  Pl. Mem. 23-25. Neither of these arguments withstands even passing scrutiny.

First, Plaintiffs have failed to point in their argument in favor of injunctive relief to a single example of actual, concrete, imminent harm, perhaps because their claims in this matter involve functions that they have no real current need to use, or whose current accessibility is not actually challenged.  See also, e.g., Def. 56.1 Resp. ¶ 67 (explaining that allegation of witnesses' future desire to run for public office is irrelevant because no claim was made in the TAC or during fact discovery that the SBOE website elements relating to becoming a candidate are not accessible); 48 (explaining that allegation that Meghan Parker plans to renew her license immaterial because the accessibility of that function is no longer challenged).  Westchester Disabled On the Move, Inc. v. County of Westchester, 346 F. Supp. 2d 473, 477-8 (S.D.N.Y. 2004), which Plaintiffs cite, finds that requiring disabled voters to vote absentee, or at a designated polling place, rather than their assigned polling place, amounts to irreparable harm  because such a requirement will impede and discourage voting.  Plaintiffs have identified no equivalent irreparable harm, and cannot do so, particularly given the current availability of multiple ways to accomplish every challenged website function (including accessible online ways to obtain the services they seek). See Dkt. 87 at 4 (because online change-of-address address function was available by numerous other means, no likelihood of success on the merits had been established).

Second, Plaintiffs inappropriately focus on monetary cost alone in discussing hardship to Defendants.  Plaintiffs seek sweeping injunctive relief covering the entirety of Defendants' websites and requiring them to take a variety of additional steps, such as hiring a third party consultant to be expressly approved by Plaintiffs themselves, and continuing Court monitoring of every item of injunctive relief.  151-35 at 4.  The relief Plaintiffs seek is not in the public interest

because it directly contradicts "the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs."  Rizzo v. Goode, 423 U.S. 362, 378, 369-70, 380 (1976) (quotation marks omitted) (court should not have entered injunction ordering petitioners to draft, for court approval, a rewrite of policies and procedures for handling civilian complaints).  This is particularly true in light of the fact that, as noted above and at length in their motion for summary judgment, Defendants already have policies, procedures, training, staffing, technology, and complaint procedures in place to promote and ensure accessibility.  See, e.g., Midgett v. Tri-Cty. Metro. Transp. Dist. of Oregon, 254 F.3d 846, 850 (9th Cir. 2001) ("[T]he fact that Tri–Met is a local governmental agency with procedures already in place for monitoring lift performance and ADA compliance militates against a federal court's mandating substitute procedures of its own design to address the same issues").

By comparison to these cases, Step By Step, Inc. v. City of Ogdensburg, 176 F. Supp. 3d 112, (N.D.N.Y. 2016), relied on by Plaintiffs, is inapposite.  There the court ordered defendants to reverse a denial of a zoning application decision based on a substantial likelihood that the decision had been tainted by discriminatory intent.  Id. at 132-33, 135-36.  Here, the record is free of any indication of discriminatory intent, and, as noted above, the injunctive relief Plaintiffs seek is both sweeping and costly, and unaccompanied by any showing it is necessary or appropriate to prevent irreparable harm.

Further, Plaintiffs' analysis of the impact of financial cost to the Defendants on the availability of injunctive relief is incorrect.  As set out in Def. SJ Mem. 38, undue burden analysis must take into account the ability of the affected agency to serve the needs of the public with the resources available to it.  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 607 (1999); Onishea v.Hopper, 171 F.3d 1289, 1304 (11th Cir. 1999) (en banc).  Apparently, Plaintiffs believe, for

example, that in order to hire additional accessibility staff, DMV could simply stop sending required notices to customers by mail, Gauthier Decl. ¶ 6, and that SBOE could stop paying the money needed to keep offices running, Connolly Decl. ¶ 31, and that both defendants could and should reroute funds earmarked as salaries for existing employees.  This is sophistry.

Plaintiffs have not approached a showing of irreparable injury, or that the balancing of equities indicates that the broad injunction sought by them, which includes an order requiring defendants to retro-fit functions soon to be replaced and old platforms that cannot effectively or efficiently be repaired, a new audit of the Websites, and Court monitoring, should be granted.

## CONCLUSION

For the foregoing reasons, and those set out in Defendants' submissions in support of their motion for summary judgment, and their motion to exclude the proposed testimony of Plaintiffs' expert, Defendants respectfully request that this Court deny Plaintiffs' motion for summary judgment in its entirely, grant Defendants' motion for summary judgment, and grant any further relief that it deems just and proper.

Dated: New York, New York
      November 13, 2017

          Respectfully submitted,

          ERIC T. SCHNEIDERMAN
          Attorney General of the State of New York
          Attorney for Defendants

By:    /s Elizabeth A. Forman
       Elizabeth A. Forman
       Noam Lerer
       Assistant Attorneys General
       120 Broadway, 24th Floor
       New York, New York 10271
       (212) 416-8538